UNITED STATES of America, Plaintiff,

v.

James A. TRAFICANT, Jr., Defendant.

Crim. A. No. CR82–148Y.

United States District Court,
N.D. Ohio, E.D.

Feb. 4, 1983.

See also, D.C., 558 F.Supp. 993.

Stephen H. Jigger, U.S. Dept. of Justice, Cleveland, Ohio, for plaintiff.

Mark Gervelis, Ashtabula, Ohio, Michael S. Harshman, Youngstown, Ohio, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Pending before the Court is defendant Traficant's Motion to Suppress Tape Recordings of alleged conversations between Traficant and several unindicted coconspirators. The government plans to introduce the tapes at trial, and therefore opposes the motion.

In ruling on the merits of a Motion to Suppress, the most important factor to consider is the accuracy, or trustworthiness,

of the evidence. This trustworthiness coefficient is to be weighed against the potential for undue prejudice when the challenged evidence is presented to the jury, with appropriate cautionary instructions that the jury make its own determination as to the weight and credibility of the evidence.

After fully considering the briefs of counsel and the facts presented in a lengthy suppression hearing, this Court denies the Motion to Suppress.

## FINDINGS OF FACT

Sheriff Traficant was indicted on August 9, 1982 and charged with participating in a bribery conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* He is accused of accepting $163,000 in bribes during his campaign for election as Sheriff of Mahoning County. The alleged bribes began in January of 1980 and continued through November 3, 1980. Traficant won the election in November 1980.

Money was allegedly received from reputed organized crime members, Charles and Orland Carrabia (Charles and Orland are brothers), James Prato and Joseph Naples, Jr. The Carrabias reportedly control a criminal organization separate from, and in competition with, an alleged criminal organization controlled by James Prato and Joseph Naples, Jr.

The FBI learned of the bribes through informants and tape recordings of conversations between Traficant and the Carrabias in which the exchange of money was discussed. These recordings were not made at the time of the alleged bribes, but were made approximately one month after Traficant's election and receipt of his last payment.

The defendant does not dispute the FBI's claims that the FBI did not make the recordings, nor did it know of, or consent to, the making of the tapes. This Court finds, from the testimony presented, that the recordings were made by Charles Carrabia without the knowledge, or consent, of Traficant or the other persons present at the meetings. See pp. 8–9, *infra.* The meetings were held at the home of the Carrabias' mother in Struthers, Ohio. During these recorded meetings, Charles Carrabia led the discussion and questioned Traficant about the money he received from the Carrabias and from Prato. In addition to the Carrabias and Traficant, also present during all, or portions, of these meetings were Andy Chappella, Joseph Fortine and Samuel Traficanti.[1] Traficant revealed that he had received money from Prato and Naples as well as from the Carrabias. This prompted Charles Carrabia to allude to his rivalry with Prato and to question Traficant about where, as between the two organizations, his loyalty was placed.

The FBI learned of the existence of the tapes through an informant. Testimony disclosed that as many as twelve copies of these tapes were made. One of these copies was seized by the FBI in a consent search of a home in Pennsylvania. Further informant tips disclosed that additional copies of the conversations were in a safe deposit box belonging to Charles Carrabia's sister. A search warrant[2] was issued for the box and the FBI seized the tapes in August 1981. It is these tapes which are the subject of Traficant's Motion to Suppress.

FBI agents testified that, after reviewing the tapes, they approached Traficant to inquire whether 1) Traficant was conducting his own investigation of the Carrabias; and 2) if he were not investigating the Carrabias, whether he would cooperate with the FBI in its attempt to investigate them, in exchange for prosecutorial immunity or leniency. The FBI agents met with Traficant several times beginning on June 15, 1981. The tapes were played briefly, and his cooperation in the investigation was discussed. The FBI agents testified, that after several months, Traficant's cooperation

---

1. Samuel Traficanti is not related to the defendant, James A. Traficant, Jr.

2. This Court examined the warrant and underlying affidavit *in camera* and concluded that the search was properly authorized.

deteriorated and the decision was made to prosecute him. Although his resignation from the Sheriff's office was discussed with the FBI, Traficant remained in office during the investigation. Since his indictment nearly nine months ago, Traficant has retained control of the Sheriff's office and continues to function in his capacity as chief law enforcement officer of Mahoning County, while under indictment.

## CONCLUSIONS OF LAW

### I. Constitutional Claims

 The Fourth Amendment's exclusionary rule does not apply to non-governmental searches and seizures. If evidence falls into the government's hands following a private search and seizure, no constitutional violation arises. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), *United States v. Coleman,* 628 F.2d 961, 966 (6th Cir.1980). Undisputed testimony establishes that the challenged tapes were not made by the government. Evidence obtained by private parties through electronic surveillance did not violate the Fourth Amendment in *United States v. Goldstein,* 532 F.2d 1305 (9th Cir. 1976) because no governmental action was present. The evidence was admissible at trial. *Id.* at 1311. Hence, the fact that tapes made by private parties without governmental knowledge or consent were later acquired by the government through a consent search does not make the tapes at bar excludable under the Fourth Amendment.

### II. Statutory Claims Under 18 U.S.C. § 2511(2)(d) and § 2515

Traficant contends that the tapes should be suppressed pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("the Act"), 18 U.S.C. § 2510, *et seq.* The interpretation of § 2511(2)(d) and its application to the tapes in question present this Court with a case of first impression.

In considering Traficant's argument, this Court looks first to the language of the statute itself.[3] Section 2511(1) generally prohibits the willful interception of any wire or oral communication; section 2511(2)(d) provides an exception to that general prohibition;[4] section 2515 prohibits the use of unauthorized intercepted information as evidence in trials such as this.

Section 2511(2)(d) authorizes a private party to intercept an oral communication upon the consent of *any* of the participants, including the interceptor, but adds an exception which forbids private party interceptions when "such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the ... laws ... or for the purpose of committing any other injurious act." It is this subexception upon which Traficant relies. He claims that 1) the government is unable to demonstrate the requisite consent of any of the parties to the taping, and 2)

---

**3.** The pertinent sections read as follows:

§ 2511(2)(d): It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State for the purpose of committing any other injurious act.

§ 2515: Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, ... if the disclosure

of that information would be in violation of this chapter.

**4.** Section 2511(2)(c) provides an additional exception not pertinent to this case. It states:

It shall not be unlawful under this chapter for a person *acting under color of law* to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception. (Emphasis supplied).

This section permits a person acting under color of law to record a conversation when that person or a person who is a party to the conversation consents to the recording. The exception does not apply to the facts at bar because, as all parties agree, the tapes were not made by the FBI or any other person acting under color of law.

that the challenged tapes were made by members of organized crime for the purpose of blackmailing him. Traficant invokes § 2515 which forbids the introduction at trial of evidence derived from the interception of an oral communication made in violation of the Act.

### A. Consent

The government has been unable to establish, through direct testimony, that any of the parties to the conversation consented to the recording. To the contrary, all of the participants, government and non-government witnesses alike, who testified at the suppression hearing stated that they were unaware of the taping and would have objected to the recording had they known of it. However, there was testimony that one of the participants in the conversation, Charles Carrabia, did consent to the taping. The government's agent also testified that the government was unable to establish Charles Carrabia's consent through direct testimony because he has been missing since December 1980, and is presumed dead. Testimony was offered that Charles' brother Orland had told an FBI agent that Charles had told Orland that Charles made the tapes.

It is law in several circuits that the unavailability of a consenting party to a conversation does not prevent proof of consent from being demonstrated by other means. *United States v. Gladney,* 563 F.2d 491, 493 (1st Cir.1977); *United States v. Haldeman,* 559 F.2d 31, 105 (D.C.Cir.1976), *cert. denied, Mitchell v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Bonanno,* 487 F.2d 654, 658–659 (2d Cir.1973). Although this Court at the suppression hearing improvidently ordered the testimony of the FBI agent stricken as double hearsay, it is well-settled law that the formal rules of evidence need not be followed at pre-trial hearings, *United States v. Haldeman, supra.* Hence, the testimony is admissible and may be considered for the purpose of establishing consent through alternate means when the consenting party is unavailable. This Court finds that these tapings were made

with the consent, or under the direction, of Charles Carrabia.

### B. Tortious or Criminal Conduct

Even if the government is able to establish consent, Traficant contends that the tapes were made for an impermissible purpose and are therefore not admissible as violative of § 2511(2)(d). Traficant relies on *United States v. Phillips,* 540 F.2d 319 (8th Cir.1976), an appeal from a perjury conviction in which tape recordings of the defendant's statements were introduced to prove he perjured himself before the Grand Jury. The appellate court remanded the case and ordered the trial court to inquire into the purpose for which the tapes were made, noting that if the tapes were made for the purpose of committing a criminal or tortious act the tapes would violate § 2511(2)(d). This determination must be made on a case-by-case basis, the court stated, referring to *Meredith v. Gavin,* 446 F.2d 794 (8th Cir.1971). *Phillips, supra* at 325. *Meredith v. Gavin,* is the predecessor to *Phillips* in which the 8th Circuit applied § 2511(2)(d) to a consent taping, but found that no criminal, tortious or injurious purpose prompted the recording. *Meredith v. Gavin, supra* at 799. Consistent with the spirit of *United States v. Phillips, supra* and *Meredith v. Gavin, supra,* this Court has fully scrutinized the facts presented in order to determine the purpose for which the recordings were made in this case.

The burden of proving an impermissible purpose by a preponderance of the evidence is on the defendant. *United States v. Phillips, supra* at 326 n. 3, 327. This Court finds that Traficant did not carry his burden. The only evidence introduced at the suppression hearing was the implication the Court might possibly infer from some self-serving statements of Traficant himself. The testimony of Traficant and Chappella, who were present when the alleged blackmail threats were made to Traficant, did not corroborate his implications. It is perhaps possible that Traficant may himself have believed the tapes were being made to blackmail him, but he of-

fered no evidence to support this belief, nor did any of the other witnesses questioned by defense counsel on this point. On direct and on cross-examination, counsel never specifically asked any of the witnesses whether the tapes were made for, or were used to, blackmail Traficant. Questions which might have elicited a response indicating that the tapes were made for blackmail purposes, failed to do so. Traficant himself, on the witness stand, never specifically delineated a course of conduct or chain of events which might have established the existence of a blackmail scheme. This Court is simply not persuaded by Traficant's self-serving statements and finds that defendant's burden of proof has not been met.

█ Even if this Court could infer that Carrabia had in fact made the tapes in question for the purpose of blackmailing Traficant, it does not appear that § 2511(2)(d) should be interpreted so as to result in the suppression of the tapes. Although, when faced with a statute which is clear and unambiguous on its face, courts do not ordinarily look to that statute's legislative history as a guide to its interpretation, when, as here, the application of the plain meaning of the statutory language leads to a result contrary to the statutory purpose, courts do consider legislative history so that the legislative purpose may be fulfilled.

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have to follow their plain meaning. When that meaning had led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act.

Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. *United States v. American Trucking Assns.,* 310 U.S. 534, 543–544 [60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345] (1940).

*Accord: Church of Scientology of California v. United States Department of Justice,* 612 F.2d 417, 420–422 (9th Cir.1980).[5]

Reference to the legislative history of the Omnibus Crime Control and Safe Streets Act of 1968 is illuminating. The Act is intended to "strike a delicate balance" between the interests of protecting private persons from abusive intrusions on their privacy and the need to equip law enforcement agencies with all available technology to ferret out and prosecute illegal activities. *United States v. Phillips, supra* at 324. *See also,* S.Rep. 90–1097, *U.S.Code Cong. & Admin.News,* 2112, 2153–2158 (1968). Clearly, the major purpose of the Act is to combat organized crime. *Id.* at 2157.

In formulating the Act, Congress recognized that organized crime had evolved into "highly organized, structured and formalized groups of criminal cartels whose existence transcends the crime known yesterday, for which our criminal laws and procedures were primarily designed." Congress stated that these "corporations of corruption" present "a unique challenge to the administration of justice." *Id.* These flourishing, yet less visible and more subtle criminal cartels, were escaping all but what the Senate Report characterized as "negligible" conviction rates. *Id.* at 2162. Organized crime's success at frustrating prosecutorial expertise prompted the Senate to conclude that "intercepting the communications of organized criminals is the only effective

---

5. *American Trucking* and its progeny are clearly distinguishable from cases such as *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). There, the Supreme Court interpreted and applied the plain language of a statute to enjoin the completion of a large and expensive dam, in order to protect snail darters. Although Congress might not have anticipated the result reached in that particular situation, the Court's strict adherence to "plain language" was consistent with the general purpose of the Endangered Species Act of 1973.

method of learning about their activities." *Id.* at 2159.

The language of § 2511(2)(d) cannot be considered standing alone, but must be construed in the context of the entire Act and its purpose. It should be applied in a manner consistent with Congressional purpose and not employed to defeat it.

■ The interests intended to be protected under § 2511(2)(d) are those recognized by the Sixth Circuit in *United States v. Jones*, 542 F.2d 661 (6th Cir.1976). In its opinion, the Court acknowledged that, while the primary target of the Act was organized crime, a clear purpose of the Act was also to "establish an across-the-board prohibition on all unauthorized electronic surveillance." *Id.* at 668. The unauthorized surveillance which was of particular concern to Congress and which was specifically contemplated by those formulating the statute was identified as occurring in the following three areas: 1) industry, 2) divorce, and 3) politics. Especially emphasized as repugnant was the pervasiveness of "snooping" by private detectives and others in the area of marital disagreements. *Id.* at 668 n. 12. Accordingly, the *Jones* Court found that the defendant's wiretapping of his estranged wife's phone was a violation of a privacy expectation which the Act was intended to protect. Section 2511(2)(d) was cited approvingly.

■ However, in the case before this Court, the interpretation of § 2511(2)(d) so as to bar the admission of the tapes would add a new category to the list of protected privacy interests—illegal activities. This Court cannot find that Congress intended to include discussions of illegal activities within the parameters of those activities having a protectable expectation of privacy. Such an interpretation of the statute would shield from prosecutorial inquiry the alleged activities of organized crime, the very evil which the Act was designed to control.

*III. Trustworthiness and Authenticity of the Tapes*

■ Finally, Traficant objects to the admission of the tapes on the ground that the government has not established the foundation requirements of *United States v. McKeever*, 169 F.Supp. 426 (S.D.N.Y.1958). It is undisputed that the tapes at issue are copies and that the government cannot produce the originals. It is also apparent that there are breaks in the recordings for which no explanation can be offered. It is not known if the recorder malfunctioned; if it was stopped by the operator; if a portion of the recording was later erased; or if the conversation was edited. Technically, it is virtually impossible to scientifically examine the tapes to answer these questions because the cause of breaks in a tape cannot be determined from a copy. Hence, it is clear that the government cannot satisfy all the requirements of *McKeever*.

These defects do not bar the tapes' admission. The standards set forth in *McKeever*, although not specifically overruled, represent a view of recording technology in an earlier time. Recent cases have developed more flexible standards for the admission of tape recorded conversations. The most important criterion for admission is that the tapes accurately reflect the conversation which they purport to record. *United States v. Haldeman, supra* at 107. This evidence may be circumstantial or direct, real or testimonial, and need not conform to any particular mode. *Id.* Testimony at the hearing satisfied this Court that the tapes accurately recorded the conversations.

■ Two government witnesses, one, an unindicted coconspirator, both of whom attended the meetings, testified that the recordings accurately reflected their recollection of the conversations that transpired at the two meetings which were recorded. Both agreed that they heard breaks in the tapes played at hearing, but did not recall any conversation substantially relevant to this case missing or deleted from the tapes. Traficant himself took the witness stand, yet failed to allege in any way that the tapes were fictionalized or manufactured, or that the conversations which were recorded did not take place, or that they were

inaccurately reproduced. His only challenge to the tapes concerned the breaks, which all admitted were present.

Traficant testified that portions of the conversation referring to the Bankruptcy Court in Cleveland, a federal judge, and the Sheriff of another county were deleted. His claim that this conversation occurred during the meetings with the unindicted coconspirators was corroborated by the government's witnesses. However, it was disputed whether these conversations occurred during the recorded meetings, or whether they transpired during a third meeting, not at issue in this case, and for which no recording is offered. Furthermore, Traficant himself testified that the deleted references were not relevant to him or this case. Nor did he contend that the deletions significantly shaded the tenor of the discussion, or contained any exculpatory material.

Testimony at the suppression hearing leads this Court to conclude that the breaks in the recordings occurred prior to the government's custody of the tapes. Additional testimony revealed that the maker of the tapes, Charles Carrabia, subsequently offered to erase portions of the conversations. However, the pertinent portions are still on the tapes, as Traficant's testimony and this Court's own examination of the transcripts revealed.

Finally, this Court notes that Traficant never claimed that the voice identified on the tape as his, in fact, was not his voice; nor that any of the other voices were misidentified. In this regard, this Court finds the *Haldeman* court's ruling on an appropriate accuracy standard instructive: "The possibility of misidentification and adulteration must be eliminated, not absolutely, but as a matter of reasonable probability." *Id.* Tapes are not to be held inadmissible merely because "one can conjure up hypothetical possibilities that tampering occurred." *United States v. Cortellesso,* 663 F.2d 361, 364 (1st Cir.1981) quoting *United States v. Haldeman, supra.*

In the instant case, the possibility of misidentification and adulteration by the government has been eliminated to this Court's satisfaction. Traficant's reliance on *United States v. Starks,* 515 F.2d 112 (3rd Cir.1975), to challenge the admissibility of the tapes is misplaced for the reason that the challenged irregularities in the tapes did not occur while the recordings were in government hands. Unlike *Starks,* not a scintilla of evidence has been presented to suggest that the government tampered with, or altered the quality of the tapes. Traficant's argument is more appropriate as a challenge to the government's chain of custody. However, the purpose of a chain of custody is to insure that the item being offered into evidence is in substantially the same condition as it was at the time the proponent of the evidence came into its possession. *United States v. The Amizon Company,* CR80–217Y (N.D.Ohio September 17, 1982), *United States v. Craig,* 573 F.2d 455 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978). Testimony by an agent, or other participant in the conversation, that the tapes are authentic and accurate may provide sufficient foundation for their admissibility into evidence. *United States v. The Amizon Company, supra, United States v. Steinberg,* 551 F.2d 510, 515 (2d Cir.1977). Accordingly, the tapes are admissible at trial and will not be suppressed.

For the above reasons, Traficant's Motion to Suppress the Tape Recordings is denied.

IT IS SO ORDERED.