**UNITED STATES of America,**

v.

**George H. VEST, Defendant.**

**Crim. No. 85–475–K.**

United States District Court,
D. Massachusetts.

May 12, 1986.

On Motion for Reconsideration
July 2, 1986.

Mark Robinson, Asst. U.S. Atty., Boston, Mass., for U.S.

Willie Davis, Boston, Mass., for defendant.

## MEMORANDUM

KEETON, District Judge.

The defendant police officer George H. Vest has moved to suppress a tape record-

ing made by co-defendant Jesse James Waters.

### I.

The tape recording at issue allegedly documents a meeting between Vest and Waters at which Waters delivered to Vest $35,000 to be paid to another police officer, Frank Tarantino. The tape recording was played for Vest in advance of his appearance before the grand jury. After the first playing of the tape, Vest denied that his voice was on the recording. Later, when questioned before the grand jury about alleged payoffs and about the alleged conversation with Waters, Vest again denied that he had acted as a middleman or in any way participated in the alleged payments by Waters to Tarantino. The tape was then played for the grand jury. After this second playing of the tape, Vest was again questioned about his knowledge of or participation in any conversation or activity related to the alleged payments. Again Vest denied that his voice was on the tape, and denied any involvement in a payoff scheme. The grand jury subsequently indicted Vest for perjury based on his responses to those questions.

Defendant Vest has moved to suppress the tape recording of this conversation allegedly between Vest and Waters on the ground that its use in any way by the government in this trial would be in violation of 18 U.S.C. § 2515.

### II.

■ The government contends, first, that defendant's motion must be denied because defendant, by appearing before the grand jury rather than refusing to do so and raising illegality of the recording as a defense to contempt charges, "waived" his right to litigate the legality of Waters' making the tape recording. This contention must be rejected. Waiver in the strict sense of voluntary relinquishment of known right is plainly inapplicable here. Moreover, even if "waiver" is used in an attenuated sense that is more aptly described as "election," *see Taylor v. Marsh,*

624 F.Supp. 1042, 1044 (D.Mass.1985), the government has been unable to cite any precedent that would support a holding that defendant must elect either to refuse to testify before a grand jury and risk contempt or forfeit his right to litigate his claim of illegality of the recording. The cases on which the government relies are *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), and *In re Lochiatto,* 497 F.2d 803 (1st Cir.1974), which the government reads as holding that a contempt hearing is the only proper forum in which defendant may litigate the suppression of illegally obtained evidence that the government attempts to introduce in grand jury proceedings. But *Gelbard* dealt with a contention that § 2515 was a defense to civil contempt for refusal to answer questions before the grand jury. And *In re Lochiatto* concerned the contention of defendants, who asserted § 2515 as a defense to contempt for failure to answer grand jury questions, that they were entitled to disclosure of court-ordered interceptions. Thus, both these cases dealt with the use of § 2515 as a defense to civil contempt. They do not support the government's assertion that the defendant forfeits his right to question the legality of an interception if he does not raise the matter by refusing to testify before the grand jury. I conclude that defendant did not, by appearing before the grand jury, forfeit his right to litigate the legality of the tape recording in this criminal action.

### III.

Defendant Vest's motion to suppress is grounded on the contention that Waters made the tape recording in violation of 18 U.S.C. § 2511(2)(d), which is a part of chapter 119 of Title 18, U.S. Code. In considering this contention, I turn first to relevant parts of the text of that chapter.

Section 2511(1)(a) makes it an offense against federal law to make a tape recording except as allowed by other provisions of that chapter.

Section 2511(2)(d) provides that

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act.

The government and defendant agree that Waters was not acting under color of law and that he was a party to the communication and had, by his act of taping the conversation, given his consent to the recording.

In these circumstances I conclude, reading §§ 2511(1)(a) and 2511(2)(d) together, that it was unlawful under federal law for Waters to make the tape recording if he did so

for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or [if he did so] for the purpose of committing any other injurious act.

On the other hand, the exception of § 2511(2)(d) would permit such a recording unless Waters did in fact make the recording "for the purpose of committing" such a "criminal," "tortious," or "other injurious" act.

### IV.

The language of the statute speaks of "the purpose" in the singular. This language would present no problem of ambiguity if in fact a person acted with a single purpose. I conclude, however, that it is ambiguous as applied to rather common circumstances in which the evidence would support a finding that the person making the recording did so with multiple purposes, one or more of which were illegal and one or more of which were permissible. Other courts considering this language have not explicitly addressed this ambiguity. I conclude that the evidence before me in this case requires that I do so.

This problem of how the law deals with acts committed for multiple purposes, or "mixed motives," is not distinctive to the present context. It arises in numerous contexts, civil and criminal, and not only in relation to statutory construction but as well in many circumstances of purely decisional law.

In general, the possible rules for determining the legal consequences of acting with multiple purposes range along a spectrum. At or near one end of the spectrum are legal rules making outcomes depend on whether a legally relevant purpose was the actor's "sole purpose" (or, at least, the sole purpose having any significant influence on the actor). At or near the other extreme are rules making outcomes depend on whether a legally relevant purpose was to any extent, even the slightest, one of the actor's purposes.

Near the middle of the spectrum are rules of two distinct types: first, those making outcomes depend on whether a legally relevant purpose was the actor's "primary" or "dominant" purpose, and second, those making outcomes depend on whether a legally relevant purpose was a "determinative factor" in the actor's conduct.

In the present context, as noted above, a legally relevant purpose is the purpose of committing any "criminal," "tortious," or "other injurious" act.

Bringing these ideas together, and incorporating as well an issue of burden of proof, one may frame some key issues to be decided here in the following ways:

To avoid suppression of the tape, must the government prove that Waters acted solely for a legitimate purpose, and not to any extent for the purpose of committing a criminal, tortious, or other injurious act? Or is it enough to defeat the defense motion to suppress if the government proves that Waters acted primarily for a legitimate purpose? Or even to any significant extent for a legitimate purpose? Or—to move from a state-of-mind standard of

"purpose" to a standard of an "objectively reasonable basis" for acting with a legitimate purpose—is it enough to defeat the defense motion that the evidence shows that Waters, being in the position he occupied at the time he made the tape recording, had an objectively reasonable basis for making the tape for a legitimate purpose?

Or, if the burden is on the defendant, must the defendant, in order to show entitlement to suppression, prove that Waters acted solely for the purpose of committing a criminal, tortious, or other injurious act? Or is it enough if defendant proves that Waters acted primarily for the purpose of committing a criminal, tortious, or other injurious act? Or is it enough to prove that a purpose of committing a criminal, tortious, or other injurious act was a determinative factor, absent which Waters would not have made the tape? Or is it enough just to prove that, in making the tape, Waters was to any extent, even the slightest, influenced by a purpose of committing a criminal, tortious, or other injurious act?

No clear guidance emerges either from the decisions interpreting the statute now at issue or from the pattern of precedents in other contexts of legal rules regarding an actor's multiple purposes. Indeed, some support can be found for rules located at each of the three principal points on the spectrum of state-of-mind rules, as well as rules depending on an objectively reasonable basis for a legitimate purpose. *E.g., Second Restatement of Torts* § 603 comment a (1977) (one who has a conditional privilege in defamation abuses the privilege by publishing defamatory matter "solely from spite or ill will" and "not in any part" to protect the interest because of which the conditional privilege is recognized); *id.* (but if the publication is made "for the purpose of protecting the interest in question, the fact that the publication is inspired in part by resentment or indignation at the supposed misconduct of the person defamed does not constitute an abuse of the privilege"); *Gold v. East Ramapo Central School District*, 115 A.D.2d 636, 637, 496 N.Y.S.2d 296, 297 (2d Dep't 1985) (under

New York prima facie tort doctrine, verified complaint was properly dismissed when it failed "to allege facts sufficient to demonstrate that ... [defendant's act] was motivated solely by a desire to harm" plaintiff); *Roberts v. Pollack*, 92 A.D.2d 440, 446, 461 N.Y.S.2d 272, 276 (1st Dep't 1983) (under New York prima facie tort doctrine, claim fails if plaintiff "fails to allege facts sufficient to demonstrate that in issuing the subpoena defendant was motivated solely by a desire to harm or torment her"); *Coleman v. Newark Morning Ledger Co.*, 29 N.J. 357, 373–77, 149 A.2d 193, 202–03 (1959), *citing* W. Prosser, *Torts* 601, 627–28 (2d ed. 1955) and *Restatement of Torts* § 603 (privilege in defamation cases is lost "if the publication is not made primarily for the purpose of furthering the interest which is entitled to protection" or if the defendant is moved "chiefly" by "motives of ill will, or to accomplish a distinct objective which may be legitimate in itself but is not within the privilege"); *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (plaintiff must show that his conduct in the exercise of First Amendment rights "was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' " in school board's decision not to rehire him; plaintiff having carried that burden, district court should have determined whether school board would have reached the same decision in the absence of protected conduct); *Monteiro v. Poole Silver Co.*, 615 F.2d 4, 9 (1st Cir.1980) ("it is by now clear, where motives are mixed, that the impermissible motive must be a determinative factor in the employer's decision if plaintiff is to prevail ..."); *United States v. Arra*, 630 F.2d 836 (1st Cir.1980) (where objectively reasonable basis for administrative search existed, evidence of contraband uncovered in Coast Guard administrative search of shipping vessel would not be suppressed even if part of motivation was to discover contraband), cited with approval in *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.

3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983).

Which of these types of rules, or some other variation along the spectrum of possibilities, should be adopted in construing the words "the purpose" as used in 18 U.S.C. § 2511(2)(d)?

## V.

The defendant contends that the statute should be read to prohibit recording by a person not acting under color of law whenever the recording is to any extent made for a purpose of commiting a criminal, tortious, or injurious act. Defendant argues that *United States v. Phillips,* 564 F.2d 32, 34 (8th Cir.1977), *cert. denied,* 435 U.S. 974, 98 S.Ct. 1620, 56 L.Ed.2d 67 (1978) (*Phillips II*) supports this contention. I conclude, however, for reasons stated below, that a careful reading of *Phillips II* does not support defendant's position.

Moreover, I conclude that to interpret § 2511(2)(d) to require suppression whenever the defendant can demonstrate that *any* part of the motivation for the recording was criminal, tortious, or injurious would in essence shift the burden of proof to the government to prove that the person who made the recording did so with *no* criminal, tortious, or injurious purpose.

It is characteristic of human experience that individuals usually—perhaps even always—act with mixed motives. To adopt the interpretation of the statute advanced by the defendant would impose on the government the nearly insurmountable burden of eliminating the possibility that an improper motive played any part in the decision to intercept the communication. I conclude that such an interpretation of the statute is basically inconsistent with the explicit statutory provisions permitting recording in some circumstances. Of course, the statute also specifies that recording is prohibited in other circumstances. These two mandates must be read together. So reading the statute, I cannot conclude that it manifests a congressional objective of fashioning such a sweeping exclusionary

rule as would result from the interpretation for which defendant argues.

Turning to a possible interpretation near the opposite extreme along the range of possibilities, I consider whether the statute can be sensibly read to require suppression only when the sole purpose for the interception was illegal, tortious, or otherwise injurious. For reasons that mirror those discussed above, I reject this interpretation. Just as the government would have great difficulty proving the absence of an illegitimate purpose as any part of an actor's motivation, so too would the defendant have virtually insurmountable difficulty demonstrating the absence of any legitimate purpose as at least in some degree a part of the actor's motivation. To adopt an absolutist interpretation of the phrase "the purpose" to mean either "in any degree" or "the sole" purpose would virtually disregard one or the other of the competing concerns that the statute accommodates, and would as well create severe problems of case-by-case decisionmaking because it would encourage disingenuous testimony and post hoc justifications.

■ I conclude that, properly interpreted, § 2511(2)(d) forbids the recording of communications between private persons by or with the consent of one of the parties when it is shown either (1) that the primary motivation, or (2) that a determinative factor in the actor's motivation for intercepting the conversation was to commit a criminal, tortious, or other injurious act. Unlike the two contrasting extreme interpretations considered above, this reading takes into account the complexity of human motivation and reflects a common sense understanding of "the purpose." The first branch of this two-part standard ("primary" motivation) is supported by the opinion on the second appeal of *Phillips,* where the court stated that "[a]lthough Overton admitted that use of the tape to publicly embarrass Phillips if he went back on his word was a 'far-fetched possibility,' the subsequent failure to so use the tape reinforces the finding that the *primary* purpose for making it was to obtain a record

of what was said." 564 F.2d at 34 (emphasis added). The second branch of the standard ("a determinative factor") is supported by precedents in other areas of the law where courts are often faced with circumstances of mixed motives. For example, when considering violations of the federal statutes prohibiting race, sex or age discrimination in employment, the courts frequently must determine whether a forbidden motive was "a determinative factor" in the firing. *E.g., Monteiro v. Poole Silver Co.*, 615 F.2d 4, 9 (1st Cir.1980) (race discrimination).

### VI.

■ Having concluded that § 2511(2)(d) forbids interception by a person not acting under color of law if either the primary purpose for interception or a determinative factor in the actor's conduct is to commit a criminal, tortious, or other injurious act, I must now consider, as factfinder, Waters' purpose or purposes in recording the conversation at issue in this case.

The government contends that Waters' "unequivocal testimony" at the evidentiary hearing established that his sole purpose in making the tape was to make a record of the payment—the practical equivalent of a "receipt." The government assumes that this "record-making" or "receipt" purpose was legitimate, relying in part on cases such as *By-Prod Corp. v. Armen-Berry Co.*, 668 F.2d 956, 959 (7th Cir.1982) (corporate officer who recorded telephone conversation, in which officer of competitor corporation described antitrust conspiracy, did not violate § 2511(2)(d); evidence was uncontroverted that officer made the recording in order to get an accurate record of the conversation that he hoped would yield evidence of an illegal conspiracy; such a "desire to make an accurate record of a conversation to which you are a party is a lawful purpose under the statute even if you want to use the recording in evidence") (citation omitted). The government further contends that the defendant has failed to introduce any evidence to suggest a purpose, *at the time*, to make the recording for use in blackmail.

Defendant, accepting "the ultimate burden of alleging and proving the specific criminal, tortious, or other injurious purpose for which the interception was made," *United States v. Phillips*, 540 F.2d 319, 326 (8th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976) (*Phillips I*), argues that Waters' stated purpose for making the tape was unlawful. Defendant reasons that the stated purpose was to have a record of the illegal transaction and that acting for this purpose is "simply one more overt act in furtherance of the conspiracy." Defendant argues also that the purpose of having a "receipt" was simply preliminary to the purpose of committing an injurious act, namely to blackmail Tarantino in order to enforce the agreement.

Having examined the record and heard the testimony of Waters at the evidentiary hearing, I find that Waters did make the tape recording for the purpose of having proof—or, as it has been described, obtaining a "receipt"—of payment of $35,000 to Vest. However, I reject the government's assumption that this is necessarily a lawful purpose. I conclude that within the factual context of this case, the "receipt" purpose encompasses two component purposes, one of which is plainly illegitimate and the other of which is dubious at best, rather than plainly legitimate. A description of the course of events proved at the evidentiary hearing helps to explain the reasons for this conclusion. In describing these events I assume, without deciding, that Waters' testimony about them is to be credited. If his testimony were not credited, the decision I reach would be compelled for even stronger reasons.

In May 1983, Jesse Waters was in the back room of one of his stores on Warren Street in the Roxbury section of Boston. He thought he heard someone say "This is a stickup," prompting Waters to come out of the back room with a gun. Waters fired his gun at another man who stood on the counter with a gun drawn. Waters' shot

felled the other man, who, although fallen to the floor, attempted to reach for his gun. Waters shot the man a second time, striking him in the hand. Shortly after that, Waters recognized the man he had shot as Detective Frank Tarantino of the Boston Police Department.

Waters was arrested and charged with a number of offenses arising out of this incident, including assault with intent to murder and assault and battery by means of a dangerous weapon. Following the indictment and his release on bail, Waters spoke with the defendant to arrange a meeting with Tarantino. At this first meeting they discussed how Tarantino could "fix" the case against Waters. Vest drove Waters to and was present during that first meeting, but did not participate.

During a second meeting, at which Vest was again present, Waters and Tarantino reached an agreement whereby Waters was to pay $200,000 to Tarantino's lawyer ostensibly in settlement of a civil action filed by Tarantino against Waters, with another $100,000 to be paid to Tarantino directly, without the knowledge of Tarantino's or Waters' attorney. In exchange for this total payment of $300,000, Tarantino was to arrange it so that Waters would not have to go to prison. Details of how Tarantino could guarantee that Waters would not serve any time in prison were not discussed.

On the evening of June 15, 1984, the defendant met Waters at Waters' office on Crawford Street in Roxbury. Waters gave the defendant $35,000 at the meeting, all of which was to be given to Tarantino as part of the $100,000 under the table payment. According to his own testimony, Waters had paid off Boston police officers before, but had never made such a large payment at one time; therefore, he taped the conversation to have a record of having actually paid the $35,000. According to Waters, he wanted to have this record as proof, in case Tarantino denied receiving the money. After the $35,000 payment, Tarantino called Waters to confirm that the defendant had delivered the money to Tarantino as promised. Waters did not thereafter erase or destroy the tape.

Once before and once after June 15, 1984, Waters gave money to the defendant to give to Tarantino, for a total of an additional $15,000. At some other time Waters met with Tarantino directly and gave him $50,000. These three meetings were not taped. In addition, Waters gave some money to Tarantino's lawyers in partial payment of the $200,000 settlement. In total, Waters paid approximately $150,-000 of the $300,000 he and Tarantino had agreed upon.

Waters went on trial in October of 1984 in Suffolk Superior Court. He did not testify at that trial. The jury found him not guilty on the charge of assault with intent to murder but convicted him of several other charges. Following the verdict Waters was held in custody at the Massachusetts Correctional Institution ("MCI") at Concord while awaiting sentencing.

During his detention at Concord, Waters called a Herbert Davis and told him to make contact with the defendant Vest. Davis was to tell Vest that Waters had a tape of the June 15th payoff and that the tape would be turned over to the federal authorities if the agreement with Tarantino was not carried out. Waters also made contact with several Boston Police officers to convey a similar message. Among them was Detective John Mulligan. Waters called Mulligan and asked him to speak with then Commissioner Jordan about the tapes. According to Waters, he never offered the tape to Jordan, but he did ask Mulligan to mention the tape to Jordan and to seek Jordan's assistance in getting a suspended sentence for Waters. Mulligan testified that he did speak to Jordan but that Jordan refused to assist Waters. (Mulligan also testified that Waters offered to give Jordan the tape in exchange for Jordan's assistance).

In November 1984, Waters was sentenced to a term of eight to ten years at MCI–Walpole. At some time in October or November, Waters decided to turn the tape over to the government. Waters told his

attorney about the tape, sent his daughter to his office to look for the tape, and then turned it over to a federal agent in December 1984.

Upon all the evidence before me, I find that the "receipt" motive presented by Waters encompasses an impermissible purpose of acting in furtherance of a criminal conspiracy. Waters indicated his concern that he needed to record the cash payment to Vest in order to protect himself against "double-crossing" by Tarantino, or Vest, or both. Otherwise, receipt of the $35,000 might be denied. It may be argued that such a denial by Tarantino or Vest would constitute a separate wrongful act against Waters from which Waters could permissibly seek to protect himself. But even though this purpose is in one sense a purpose of self-protection against the threatened injurious act of another, it is at the same time one of furthering the conspiracy. That is, Waters hoped in this way to cause Tarantino to perform his function in the alleged conspiracy to which Waters testified—to cause action to be taken to guarantee that Waters would not serve any time in prison. For this reason, the present case is unlike cases, on which the government relies, in which a purpose of recording conversations with co-defendants was to improve the recording defendant's position for plea bargaining. *See, e.g., United States v. Ruppel,* 666 F.2d 261, 271 (5th Cir.), *cert. denied,* 458 U.S. 1107, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982) (such a purpose held to be a self-protective purpose permitted under § 2511(2)(d) ).

■ The finding that one of Waters' purposes in making the tape was to protect himself against double-crossing by Tarantino is not alone decisive. Nor is it decisive to find that Waters' use of the tape might "injure" Tarantino. These findings do not establish either that Waters' purpose was "criminal" or "injurious" within the meaning of the statute or, on the other hand, that it was legitimate. Obviously any self-protective use of the tape by Waters would be contrary to Tarantino's and Vest's interests, and in that sense "injurious" to them.

However, making a tape for use in a lawfully self-protective manner is not within the proscription of 18 U.S.C. § 2511(2)(d) because the interception is not done for the purpose of causing injury in the relevant legal sense. Injury is not the actor's objective but only an incidental consequence of an act done for a permissible purpose. This point helps to explain why it is not decisive here that in the factual circumstances of other cases courts have concluded that a self-protective purpose was not a purpose to commit a criminal, tortious, or other injurious act within the meaning of § 2511(2)(d). *See, e.g., United States v. Ruppel,* 666 F.2d at 271.

■ Also, it is true that the mere fact that the substance of a conversation concerns criminal activities does not in itself lead to the conclusion that the taping of such a conversation is also a criminal act or is motivated by criminal designs. *See, e.g., United States v. Turk,* 526 F.2d 654, 657 n. 1 (5th Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976) ("The exemption applies, then, even if the purpose of the conversation is criminal, as long as the purpose of the recording is not.").

Nevertheless, on the evidence before me in this case I find that the "receipt" purpose advanced by Waters also encompasses an impermissible purpose, namely, to advance a criminal conspiracy. Within the context of the "arrangement" between Waters and Tarantino, Waters' desire to tape record a payment made to Vest for Tarantino must be understood in part as an attempt to ensure that the arrangement between Waters and Tarantino was carried out. One clear inference from Waters' testimony is that the tape was to be a record of the payment to be used by Waters, if necessary, to force Tarantino to fulfill his end of the bargain. Such a purpose in recording the conversation is in furtherance of the criminal conspiracy and is a purpose to commit a criminal act.

It is the prevailing rule of the case law interpreting § 2511(2)(d) that the defendant bears the burden of proving by a preponderance of the evidence his contention of

illegitimate purpose in making the recording. *Phillips I,* 540 F.2d at 325–26; *Phillips II,* 564 F.2d at 34 n. 4; *United States v. Traficant,* 558 F.Supp. 996, 1000 (N.D. Ohio 1983). As the court noted in *Phillips I,* "[t]he risk of nonpersuasion shall remain with the defendant." *Phillips I,* 540 F.2d at 326 n. 3.

For reasons stated above, I find that Waters made the recording as a receipt, and that although this purpose itself encompassed two subsidiary purposes, one of these was the purpose of recording to further his conspiratorial plan and this was a purpose to commit a criminal, tortious, or other injurious act. I find also that this was Waters' primary purpose and a determinative factor in his motivation for recording. I conclude that defendant Vest has carried his burden of proving illegitimate purpose in Waters' making the recording, under both branches of the applicable standard ("primary purpose" and "a determinative factor"). I conclude also that meeting either of these branches of the standard is sufficient to meet the defendant's burden of proving illegality of the recording.

### VII.

Remaining for consideration are the government's arguments that, even though Waters made the tape recording in violation of 18 U.S.C. § 2511, the government should not be forbidden to use the tape recording in this prosecution for perjury.

I have found that the recording was made in violation of 18 U.S.C. § 2511(1)(a) and (2)(d). Another provision of this section declares that it is a violation of law to disclose information willfully, "knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection." 18 U.S.C. § 2511(1)(c). On the facts of the present case, I find that the government is seeking disclosure, "having reason to know" that the recording was obtained in violation of § 2511(1)(a) and (2)(d).

These findings and conclusions establish that the exclusionary rule stated in § 2515 applies. That rule is as follows:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515.

The government argues, however, that § 2515 should not be construed as a sweeping, unqualified preclusion of all prosecutorial use of an illegally made tape recording. It argues, first, that § 2515 is inapplicable to prosecutions for perjury and, second, that even if applicable to preclude use in the government's case in chief, § 2515 is inapplicable to use for impeachment. Should either or both of these contentions be sustained?

■ In considering questions of statutory construction like those presented by these contentions, a court must first read the statute in a straightforward search for the meaning manifested in the text itself. *Cf. United States v. Rutherford,* 442 U.S. 544, 551–52, 99 S.Ct. 2470, 2474–75, 61 L.Ed.2d 68 (1979) (Marshall, J., writing for a unanimous Court, "if a legislative purpose is expressed in 'plain and unambiguous language, ... the ... duty of the courts is to give it effect according to its terms' (citations omitted). Exceptions to clearly delineated statutes will be implied only where essential to prevent 'absurd results' or consequences obviously at variance with the policy of the enactment as a whole" (citations omitted)). If a plain meaning is disclosed by reading the text of the statute, and the application of that meaning does not produce results that are "absurd" or "at variance with the policy of the enactment as a whole," that ends the inquiry.

When reading § 2515 with the objective of fidelity to the legislative mandate, however, one may be troubled about construing the phrase "received in evidence in any trial, hearing, or other proceeding" as meaning that in no circumstance will any exception to the statutory rule of exclusion be allowed. On the one hand, it may be argued that the statutory command to suppress information obtained from the illegal recording is unconditional and must be read as precluding all exceptions. In response, however, it must be noted that Congress, like any other legislative body and like all other users of language, rarely states explicitly every condition and qualification that one senses when reading text in context, in a genuine search for manifested meaning.

■ Moreover, when reading the text of a statute in search of manifested meaning, a court must read not only the particular provision that is the central focus of inquiry but as well other provisions within the entire statute that literally are part of the context. *Cf. Rutherford, supra.* If in its entire text the statute manifests a legislative choice to prescribe an accommodation between somewhat clashing or conflicting interests, the court must be cautious about taking any single provision, prescribing protection for one of those clashing interests, as subject to no exceptions in any circumstances. To read each of two provisions in that way may place them in direct conflict with each other because they focus upon different interests. For example, the statute here under consideration plainly declares that recording is permissible in some circumstances and impermissible in others. Also, it plainly includes some provisions aimed at serving the public interest in use of credible evidence to support prosecutions for criminal offenses, but others aimed at protecting privacy and deterring violations, even to the extent of using sanctions that sometimes deny use of credible evidence that may be essential to effective prosecution for a crime.

■ When a statute contains two provisions that, read separately, focus upon different and somewhat conflicting interests, to understand the meaning of the two provisions together, a court must read at least one, and perhaps both, as necessarily subject to some implicit exceptions. If a court is unable by reading the entire text to determine a plain meaning of the text as a whole as to what those implicit exceptions are—at least to the extent necessary to resolve the disputed issues of meaning relevant to the case at hand—then the search for an answer solely in the text of the statute has failed.

■ Though the issue is close and debatable, I conclude that in this instance the search for plain meaning in the text of chapter 119 fails and that it is appropriate to look beyond the text of the statute for guidance in construing § 2515. As noted above, chapter 119 strikes an accommodation between conflicting interests, each highly valued in the legal system. The text of chapter 119, taken as a whole, does not prescribe, either explicitly or implicitly, a clear answer either to the question presented in this case regarding use of an illegally made tape recording in prosecutions for perjury, or to the question regarding use for impeachment. I therefore conclude that it is appropriate to look beyond the text of the statute for guidance in construing it.

■ The two most obvious sources of potential guidance outside the text itself are, first, legislative history and, second, analogies that may be found within the settled rules of the legal system that were a part of the context in which the legislation was enacted.

Before turning to those sources for guidance, I pause to consider other arguments advanced by the government. The government's arguments that the deterrent objectives of an exclusionary rule are inapplicable to a prosecution for perjury miss the mark. Also off the mark are arguments that concerns about deterrence of official misconduct are inapplicable to the use by prosecutorial officials of a recording made illegally by one who not only was not act-

ing in legitimate cooperation with police or prosecutors but instead was acting in a conspiracy to corrupt the administration of justice. *Cf. Phillips I,* 540 F.2d at 327 n. 5 (rejecting government's argument that tape was admissible because government had no part in the decision to record the conversation). Those arguments do bear upon whether an exclusionary rule in this setting is a wise legislative choice. But the issue here is what *was* the legislative choice, not whether it was a wise choice.

■ No matter how vulnerable to criticism the statute may be when properly construed, the court is not free to improve upon it. It is not the function of courts to pull legislative chestnuts out of the fire. Rather, courts must enforce legislation as it is enacted. *Cf. Sedima v. Imrex Co.,* — U.S. ——, 105 S.Ct. 3275, esp. 3285–87, 87 L.Ed.2d 346 (1985) (rejecting contention that overly broad scope of the statutory text, if literally applied, is a legitimate reason for courts to fashion a narrower construction; "this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress"). *See also United States v. Manuszak,* 438 F.Supp. 613, 619 (E.D.Pa.1977) (rejecting contention that court should apply narrower judicial exclusionary rule rather than broadly sweeping statutory exclusion of § 2515 to use of allegedly illegal wiretap in probation revocation hearing; "Nonetheless Congress has spoken and I am not free to disregard its clear mandate. Relief from the perceived undesirable effects of the statutory exclusionary rule must be sought through legislative, not judicial action").

With respect to sources of guidance outside the text of the statute, the government has been unable to point to anything in the legislative history, except for a passage quoted below, that would provide even arguable support for a determination that the statutory proscription is subject to an unstated but implicit exception for prosecutions for perjury. Thus, the government's contention regarding use of the illegally made tape in prosecutions for perjury de-

pends for support upon this one passage in legislative history and whatever support can be derived from analogous rules found in the legal system generally, within the framework of which § 2515 was enacted. The government also relies on this same passage of legislative history to support a determination that § 2515 does not prohibit use of an illegally made recording for impeachment.

The relevant passage from legislative history, appearing in the Senate report accompanying the Omnibus Crime Control and Safe Streets Act of 1968 explains:

Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with other prohibitions of the chapter. It provides that intercepted wire or oral communications or evidence derived therefrom may not be received in evidence in any proceeding before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision of a State, where the disclosure of that information would be in violation of this chapter.... It largely reflects existing law. It applies to suppress evidence directly (citation omitted) or indirectly obtained in violation of the chapter (citations omitted). There is, however, no intention to change the attenuation rule (citations omitted). Nor generally to press the scope of the suppression role [sic] beyond present search and seizure law. *See Walder v. United States,* 74 S.Ct. 354, 347 U.S. 62 [98 L.Ed. 503] (1954).

S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. *Code Cong. & Ad. News* 2112, 2184–85. The citation of *Walder,* the first case that established a limited exception to the exclusionary rule for use of illegally obtained evidence to impeach, strongly supports the interpretation of § 2515 as not prohibiting the use for impeachment purposes of an interception that violates § 2511.

Because legislative history invokes the decisional exception that allows use of an

illegally made tape for impeachment, cases cited by the government (even those decided after enactment of the legislation) lend further support to a reading of the statute that permits an illegal recording made in violation of § 2511 to be used for the limited purpose of impeaching the testimony of a party whose conversation was intercepted. *See, e.g., United States v. Caron*, 474 F.2d 506 (5th Cir.1973) (even if unlawfully made, wiretap may be used for impeachment purposes in perjury trial); *United States v. Winter*, 663 F.2d 1120 (1st Cir. 1981), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983) (court-authorized wiretap, even if in violation of § 2518(9), may be used to impeach defendant on cross-examination); *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (t-shirt illegally seized may properly be used to impeach defendant based on his answers in cross-examination); *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (inculpatory statements made by defendant who had received *Miranda* warnings and asked to telephone attorney are not admissible in case in chief but are admissible for impeachment purposes); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (statements by defendant that are inadmissible under *Miranda* are nevertheless admissible for use in impeachment); *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (evidence obtained through illegal search and seizure can be used to impeach defendant who asserts on direct examination that he has never possessed any narcotics).

In summary, I conclude that the statute permits the government to use the illegally recorded tape for impeachment, should the defendant take the stand.

A different and more difficult problem is presented with respect to what support can be found for construing § 2515 as allowing an exception for use of information from an illegal recording as part of the prosecution's case in chief, even though the prosecution is for perjury rather than for an offense of which the recorded com-munication or event was one of the alleged criminal acts. The strongest argument that can be made for support in legislative history derives from the last two sentences of the passage quoted above, that is

> There is, however, no intention to change the attenuation rule (citations omitted). Nor generally to press the scope of the suppression role [sic] beyond present search and seizure law. *See Walder v. United States*, 74 S.Ct. 354, 98 L.Ed. 503, 347 U.S. 62 (1954).

But, as already noted, the citation of *Walder*, which follows those sentences, concerns use for impeachment, not use in a perjury prosecution. To read this as meaning that the statute commits to courts the authority and responsibility for developing and applying exceptions to this statutory proscription to the same extent as courts develop and apply exceptions to the judicially fashioned exclusionary rule for constitutionally prohibited police behavior seems dubious. Though the issue is debatable, I conclude that reading the statute as conferring such broad discretion on the courts is inappropriate.

I recognize that the opinion in *United States v. Traficant*, 558 F.Supp. 996 (N.D. Ohio 1983), may be read as expressing a view contrary to the conclusion I have reached. That case is distinguishable on the facts because the court there held that the defendant, claiming illegality of tape recordings under § 2511(2)(d), had failed to sustain his burden of proving that the person who made the recordings had acted with an impermissible purpose. Nevertheless, as an alternative ground of decision the court reasoned that even if in fact the tapes were made for the purpose of blackmailing the other participant in the conversation, "it does not appear that § 2511(2)(d) should be interpreted so as to result in the suppression of the tapes." 558 F.Supp. at 1001. In so concluding, the court relied upon references in legislative history to the legislative purpose that the Act

> "strike a delicate balance" between the interests of protecting private persons from abusive intrusions on their privacy

and the need to equip law enforcement agencies with all available technology to ferret out and prosecute illegal activities. (Citations omitted).

*Id.* The court reasoned further that construing § 2511(2)(d) as barring use of tapes such as these would "add a new category to the list of protected privacy interests—illegal activities," a result that would "shield from prosecutorial inquiry the alleged activities of organized crime, the very evil which the Act was designed to control." *Id.* at 1002.

In contrast with this view, I conclude that a proposed exception from suppression for tape recordings made in the course of "illegal activities"—or even more narrowly, made in the course of "activities of organized crime"—is plainly broader than any exception recognized by higher courts either as a matter of construing a statutory proscription or as a matter of developing the scope and limits of a judicially fashioned exclusionary rule. Such an exception would also be strikingly inconsistent with the declaration in the text of the statute that a recording is illegal if made for the purpose of committing a criminal act. For these reasons and because of the different reading of the legislative history that I have expressed above, I conclude that neither the text of the statute nor the legislative history supports an exception for tape recordings made for the purpose of furthering illegal activities.

The only remaining support for the government's contention is the body of decisional law regarding perjury prosecutions. The government cites: *United States v. Turk, supra* (tape recording seized during illegal search could properly be admitted in perjury trial when perjury occurred after the search and with the full knowledge of the defendant that the search had taken place); *United States v. Raftery,* 534 F.2d 854, 857 (9th Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 167, 50 L.Ed.2d 141 (1976) (illegally seized evidence that had been suppressed in state proceeding could be used to prove the "entirely separate offense" of perjury before a federal

grand jury); *United States v. Finucan,* 708 F.2d 838 (1st Cir.1983) (evidence obtained in illegal search by state officials is admissible in federal prosecution for perjury); and *People v. McGrath,* 46 N.Y.2d 12, 412 N.Y.S.2d 801, 385 N.E.2d 541 (1978), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1535, 59 L.Ed.2d 788 (1978). Although *McGrath* involved a statutory exclusionary rule (a state statute fashioned after § 2515), the issue before the court was not preclusion of use of the tape itself, but rather whether the court should preclude use of allegedly false and evasive answers before a grand jury as evidence in a later contempt proceeding based upon those answers. Relying on the attenuation principle, the court held that the answers given before the grand jury could be used in the contempt proceeding although the questions asked derived in part from information obtained through the illegal wiretap.

With the exception of *Traficant* and *McGrath,* the cases relied upon by the government concern judicially fashioned exclusionary rules. Thus, they do not directly address the question presented here—whether § 2515 can properly be construed as implicitly authorizing an exception for perjury prosecutions. Moreover, all these cases were decided after § 2515 was enacted. Neither in legislative history nor in the body of decisional law existing as a part of the context in which § 2515 was enacted was there any suggestion that the exclusionary rule of § 2515 is subject to an exception for perjury prosecutions. In these circumstances, by adopting the government's proposed position a court would itself be fashioning an exception rather than deriving that exception either from the text of the statute or from guidance in other sources to which a court may appropriately look when construing a statute.

In summary, I conclude that that statutory exclusionary rule stated in § 2515 cannot properly be construed as subject to an exception for perjury prosecutions.

## VIII.

 In making the ruling stated above with respect to allowing impeachment use, I have treated defendant's motion to suppress even as to impeachment use and the government's alternative argument in favor of admissibility for the purpose of impeachment as requests for a ruling in limine. Under the decisions of the First Circuit, a trial court has the discretion to rule on pretrial motions before trial and must rule before trial on pretrial motions to suppress as well as other pretrial motions that are "capable of determination without the trial of the general issue." *United States v. Barletta,* 644 F.2d 50, 59 (1st Cir.1981). I conclude that the issue of limited admissibility of the tape is at least within the scope of matters that, under *Barletta,* a trial judge may properly decide before trial. In the present instance, I conclude that it is in the interests of justice that I address this issue at this time and make this ruling in limine, rather than declining to consider it unless and until the defendant has elected to testify. Such a ruling in limine is particularly appropriate in this case where there has been a pretrial evidentiary hearing and where counsel, in addressing the defendant's motion to suppress, have fully briefed, argued, and submitted numerous memoranda on all issues relating to admissibility of the tape. In these circumstances, it would be contrary to the interests of the parties in prompt resolution of this case as well as contrary to the principles of sound judicial administration to defer ruling on admissibility of the tape for the purpose of impeachment.

Order will be entered accordingly.

## ORDER

For the reasons stated in the Memorandum of this date, it is ORDERED:

Defendant Vest's motion to suppress the tape recording made by co-defendant Waters is sustained as to any use of the tape by the government during its case in chief and is denied as to potential use by the government for impeachment should the defendant elect to testify.

## ON MOTION FOR RECONSIDERATION

On Motion for Reconsideration, the government argues that disclosure or use of the Waters/Vest tape recording in the government's case in chief would not violate the provisions of Title III for two reasons:

1. The statutory exclusionary rule contained in Section 2515, along with the criminal and civil penalty sections of Title III, was intended to be a sanction against the "procurer" (maker) of the tape recording, whether it be the government acting under color of law or a private party not acting under color of law. This suppression sanction was never intended to apply in cases where, as here, the party seeking disclosure was *not* the "procurer" of the illegal recording.

2. Those cases, (including the *Winter* case in this Circuit) which look beyond the plain language of the statutory exclusionary rule of Title III to allow the government to use unlawfully intercepted conversations for impeachment purposes in order to prevent *false testimony* from going unchallenged in court, also support the application of a similar rule to government use of unlawfully intercepted conversations in *perjury* prosecutions, especially where the government was not the "procurer" of the illegal interception.

Memorandum in Support of Government's Motion for Reconsideration at 2.

Insofar as the government argues (as its second reason) that legislative history and precedents regarding use of the tape for impeachment support also use in the case in chief in a perjury prosecution, I will not add to what is said in the Memorandum previously filed. The remainder of this Memorandum responds briefly to the government's argument, in both of the two statements of reason quoted above, that § 2515 should not be construed as forbidding use or disclosure by the government where the government was not the "procurer" of the illegal interception.

■ The government has called to my attention one Title III case in which the government was permitted to use a tape recording that had been illegally made by a private party, *see United States v. Liddy*, 354 F.Supp. 217 (D.D.C.1973). However, *Liddy* involved a very different factual setting, one in which the recording was being used to prosecute the illegal procurer himself for having violated Title III. As both the text of the statute and the legislative history make clear, there must necessarily be an exception allowing use and disclosure of an intercepted communication in order to prosecute the illegal wiretapper. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. at 99–100 (1968); and *United States v. Liddy*, 354 F.Supp. at 221. To read the text otherwise would be to disregard the plain statement that a violator is subject to criminal penalties. Such a limited exception permitting disclosure in order to prosecute the illegal procurer does not, however, require or even imply the exception the government seeks in this case, namely disclosure and use by the government to prosecute the person whose conversation was illegally intercepted. I conclude that *United States v. Liddy* does not lend support to the government's contention that § 2515 is concerned solely with punishment of the procurer and not at all with protection of the privacy of the party whose conversation was illegally intercepted.

The government has also called attention to portions of legislative history in which arguments were being made "that the sanction against private consent recording or eavesdropping be confined to tort remedies and exclusion of the use of information so obtained in any judicial proceeding by the procurer." 114 Cong.Rec. 14,477 (1968). (Remarks of Senator Long of Missouri quoting from the New York Bar Association's draft report on the proposed wiretap legislation). However, these arguments represent portions of the debate over various versions of the bill and amendments then under consideration, and do not purport to be explanations of the bill as it was finally enacted. Thus, although of some interest, the quoted passage is far from persuasive on the issue of the appropriate understanding of the ultimate statutory language.

Defendant's response to the government's motion for reconsideration does not challenge the government's contention that the Supreme Court has held that suppression is not warranted because of a violation of Title III if the provision violated does not "play a central role in the statutory scheme," does not serve a "substantive role" in that scheme, and, in the words of the Ninth Circuit, does not relate to a "central or functional safeguard" of Title III. *See respectively United States v. Giordano*, 416 U.S. 505, 528, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974); *United States v. Chavez*, 416 U.S. 562, 578, 94 S.Ct. 1849, 1857, 40 L.Ed.2d 380 (1974); *United States v. Chun*, 503 F.2d 533, 542 (9th Cir.1974).

Defendant responds, however, and I conclude, that the illegality I have found in this case is a violation of a provision that is central, fundamental, and substantive—a provision designed to protect privacy by forbidding unauthorized private interception as well as unauthorized governmental interception of private communications.

The Supreme Court decisions on which the government relies in this argument were concerned with claimed violations of the provisions regulating the way in which the government may obtain authorization for interception. It was in that context that a distinction was drawn between violations of provisions described as "central," "substantive," and "functional safeguards" and violations of other provisions that do not meet these descriptive terms. Applying that distinction, I conclude that the provision violated in this instance is indeed central and substantive. It is the principal protection Title III provides against invasions of privacy by *private* as distinguished from governmental interception of private communications.

To hold that section 2515 does not prohibit the government's use of recordings made illegally if the government was not a procurer would eviscerate the statutory pro-

tection of privacy from intrusions by illegal private interception. Such a construction of the statute would leave little protection against invasions of privacy occurring, for example, when one person engages a private investigator to make illegal recordings in order to gather evidence for the purpose of taking it to the government for use in a criminal prosecution. This sort of invasive private spying is plainly within the scope of intrusions on privacy that Congress sought to deter by prohibiting private as well as governmental interception. Both for this reason and because added references in the government's argument to legislative history do not support such an evisceration of the statutory protection of privacy, I conclude that the government's motion for reconsideration must be denied.