UNITED STATES of America

v.

Henry G. CISNEROS, et al., Defendants.

No. 97–0485 SS.

United States District Court, District of Columbia.

July 26, 1999.

Brendan Vincent Sullivan, Jr., Williams & Connolly, Marcie Robin Ziegler, Washington, DC, for Henry G. Cisneros, defendants.

Matthew Stuart Rosengart, Mark Vincent Jackowski, U.S. Attorneys, Office of Independent Counsel, Washington, DC, for U.S.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on defendant, Henry G. Cisneros' Motion to Suppress and Exclude Tape Recordings Secretly Made by Defendant Medlar. Over the course of three weeks, beginning on June 21, 1999, this Court held a hearing on defendant's motion. The relevant facts and legal analysis are set forth below.[1]

## FINDINGS OF FACT

Mr. Cisneros ("Cisneros") seeks the suppression of 26 tapes made by his former mistress, Linda Medlar ("Medlar").[2] The tapes reflect phone conversations between Cisneros and Medlar that occurred between April 1990 and December 1993. The tapes were made by Medlar without Cisneros' knowledge or consent. All 26 tapes the government wishes to introduce are copies of originals Medlar destroyed some time prior to July 1994. Of the 26 tapes, Medlar testified twenty two are accurate copies of the originals. The remaining four contain omissions of certain

---

1. The findings of fact are for these proceedings only and are not binding on the parties with respect to the proceedings that may follow this determination.

2. The 26 tapes the Office of Independent Counsel ("OIC") wishes to introduce at trial constitute less than half of the some 88 tapes Medlar recorded.

information Medlar redacted during the copying process.

Medlar began taping her conversations with Cisneros in 1990, approximately three years after the two began an affair while Medlar was working for a political committee to raise money for Cisneros' mayoral candidacy in San Antonio, Texas.[3] While working for Cisneros, Medlar started her own business fund-raising for other political candidates.

The two kept their affair secret until the fall of 1988. On October 14, 1988, after interviewing both Medlar and Cisneros, a local San Antonio newspaper exposed the affair. Although she had spoken to the reporter prior to publication, Medlar testified that the story misquoted her. Shortly after the article appeared Medlar received calls from clients of her personal fund-raising business advising her that they wished to cancel their contracts with her.

In 1989, as a result of her affair, Medlar's husband filed for a divorce. The divorce was finalized in 1989. The divorce decree permitted Medlar to retain joint custody of her daughter. Although Medlar continued to reside in the house she and her former husband previously occupied she received no direct financial support from her former husband as a result of the divorce.

As a result of the October 14, 1988 newspaper article Medlar testified she was unable to obtain employment. In January 1990 Medlar requested financial assistance from Cisneros in order to support herself and her daughter. According to Medlar's testimony Cisneros began to provide her with monthly payments of some $4,000.[4]

In February 1990, Medlar began to tape-record her phone conversations with Cisneros. The reasons were twofold: First, she wanted a record of what she believed to be Cisneros' promise to her to provide financial support. Second, she wanted a record of Cisneros' statements to her to combat what she believed to be his inaccurate public representations about the nature of their relationship. Although Cisneros continued to provide financial assistance during this period, Medlar testified she began to feel uneasy about their relationship. In particular, she was worried about her ability to support herself and her daughter in the event her relationship with Cisneros and the financial support ceased. Accordingly, Medlar did not record all of her phone conversations with Cisneros, but only turned on the recording device when she felt particularly "insecure" about their relationship.

In May 1990 Medlar consulted an attorney in San Antonio, Patrick Maloney, to determine whether or not she had an enforceable financial agreement with Cisneros. Maloney advised her that she had a weak legal claim under Texas law due to the absence of a written agreement. Maloney testified he was unaware of the existence of the tapes at the time he rendered his advice.

In May 1991 Medlar moved to Lubbock, Texas where she continued to tape her conversations with Cisneros.

On January 21, 1993 Cisneros was appointed and confirmed as Secretary of Housing and Urban Development ("HUD"). The following January, 1994, Medlar receive a final payment from Cisneros, a lump sum in the amount of approximately $10,000.

Because of her extremely poor financial condition Medlar contacted a local bankruptcy attorney, Bruce Magness in July 1994. Medlar testified she intended to file for bankruptcy as the payments from Cisneros had ceased and she was still not able to obtain suitable employment. In their initial meeting, Medlar told Magness about her relationship with Cisneros and

---

3. Both Medlar and Cisneros were married at the time they began their affair.

4. Medlar testified that the initial payment was $3,000. However, after January 1990, that sum was increased to $4,000 a month.

the financial assistance he had provided her in the past. She told him that she had some 88 tapes of her conversations with Cisneros. Based on this information Magness testified that he believed Medlar might have a legal claim against Cisneros and requested permission to listen to the tapes. In response to this request Medlar provided Magness with several tapes.

Shortly after his initial meeting with Medlar, Magness consulted a second attorney, Floyd Holder who agreed to assist Magness in his representation of Medlar. The two attorneys and Medlar then entered into a contract under which Holder and Magness agreed to file a civil action against Cisneros and to pursue other courses of action intended to generate revenue. A media campaign to publicize the lawsuit was a part of this strategy. In preparation for the filing of the suit and the hoped for media interest, the three began to listen to, and transcribe, the tapes. Ms. Medlar, with the assistance of her sister, prepared a number of transcripts; Magness prepared a few on his own and Floyd Holder's secretary prepared others. Both Magness and Holder testified that at all times during the listening and transcribing process they believed they were working from "copies" of the original tapes that Medlar kept safeguarded in her possession. They testified they had not explicitly advised Medlar to delete any content from the tapes during the duplicating process.

On July, 28, 1994 Medlar filed suit against Cisneros.[5] Shortly thereafter, on August 3, 1994, the television show "Inside Edition" contacted Magness indicating an interest in Medlar's story. Pursuant to its request, Magness furnished "Inside Edition" with certain tapes and transcripts of them. In September, 1994 "Inside Edition" ran a story on the Medlar–Cisneros affair during which time they played portions of two copies of tapes provided to it.

After the "Inside Edition" story ran, Medlar was contacted by agents of the Internal Revenue Service ("IRS") and the Federal Bureau of Investigation ("FBI") which had began a criminal investigation into the financial affairs of Cisneros. On September 28 and 29, 1994 Medlar provided copies of the 88 tapes to agents of the FBI at a meeting in Lubbock. Over the course of the next two years, Ms. Medlar met with the FBI a total of eleven times to discuss matters relating to their investigation and the tapes.[6] At all such meetings Medlar led the agents to believe the tapes they had in their possession were the originals. In truth, the tapes Medlar provided to the FBI, the IRS, and the OIC were all copies. Medlar testified she had disposed of the originals some time before the initial meeting with the FBI in the fall of 1994.

At the hearing, the OIC presented Mr. Bruce Koenig ("Koenig"), a tape expert, who had been retained to determine the authenticity of the tapes in the government's possession.[7] In the beginning the OIC believed Medlar had provided it with original tapes. Later it became suspicious as to whether the tapes were in fact original. Koenig was asked to determine whether in fact they were originals.[8] Mr. Koenig testified that all of the tapes he examined were copies of originals and that a number of them were second or third

---

**5.** On May 19, 1995 this suit settled for $49,-000.00.

**6.** Medlar also met with agents of the IRS and the OIC during this time and provided copies of the tapes to them as well.

**7.** The tapes examined by Mr. Koenig include the tapes the government wishes to use at trial.

**8.** When the OIC received Mr. Koenig's report that the tapes were not originals, the office

immediately terminated its so called "cooperation arrangement" with Medlar. Later the OIC indicted Medlar for bank-fraud and money laundering, who after her plea received a sentence of 42 months. After serving almost one year of her sentence Medlar and the OIC arrived at a new cooperation arrangement and it is with respect to that agreement that she testified in the present suppression hearing and is expected to testify at the trial.

generation copies. All of the tapes contain what Mr. Koenig referred to as "record events". A "record event" is any event where the tape-recorder is stopped or started, paused, or where information is over-recorded.[9] A record event can occur during the original taping or the copying process.

Mr. Koenig testified that none of the tapes he examined were spliced, nor contained portions of conversations taken from one part of a tape and moved to another. In other words, there are no additions, inserts, or manufactured statements on the tapes.

### CONCLUSIONS OF LAW

Mr. Cisneros sets forth two grounds in support of his suppression motion. First, he argues the tapes were made in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"). As an alternative ground for suppression, he contends the tapes are unreliable, unauthenticated, edited copies. The Court will consider each ground.

#### A. Title III Violation

 Title III regulates and prohibits the interception of certain wire and oral communications by private parties and governmental entities. Under Title III it is not unlawful for a private party to intercept a communication to which he or she is a party, unless "such communication is intercepted for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any State". 18 U.S.C. § 2511(2)(d). The determinative factor in assessing whether an intercepted communication violates § 2511(2)(d) is whether the primary motivation, or a determinative factor in the party's motivation for intercepting the con-

versation was criminal or tortious. *United States v. Dale*, 991 F.2d 819, 841 (D.C.Cir. 1993). To be suppressed the recorded conversations must have been made with the specific primary, or determinative, intent of using the tapes for an illicit purpose. *United States v. Phillips*, 540 F.2d 319, 324–26 (8th Cir.1976).

Cisneros contends Medlar made the tapes with the intent of using them to commit a crime, namely extortion and blackmail. As evidence of Medlar's intentions Cisneros relies on certain allegations in the indictment charging him with making payments to Medlar in order to "assure her public silence" (Indictment, Count I) and lying to the FBI about the nature of the payments (Indictment Count 7). Cisneros also relies on the fact Medlar used the tapes in her civil litigation against him as proof of her improper motives.

 Neither the allegations in the indictment, nor the fact that Medlar introduced some of the tapes in her civil litigation against Cisneros, demonstrates Medlar's intent in recording the conversations between 1990 and 1993. Medlar testified, without contradiction, that her purposes in recording the conversations were to preserve a record of the financial agreement between herself and Cisneros and to maintain a record of his statements to her in the event she needed to correct inaccurate public accounts of their relationship. Neither of these reasons is prohibited by Title III. The fact that the indictment describes the payments as "hush money" says nothing as to Medlar's motives in making the tapes. Medlar testified that she believed Cisneros was unaware of the existence of the tapes during the entire time she was recording.[10] Likewise, the fact that Medlar used the

---

9. An over-recording occurs where a tape is rewound after it has been recorded and then the record button is pressed again in order to record over the information. An over-recording can result in a deletion of recorded material. Mr. Koenig identified eight places on the tapes where such over-recordings occurred.

10. Medlar testified the first time she believed Cisneros became aware of the existence of the tapes was in September 1994 after the "Inside Edition" story ran.

tapes in her civil suit in 1994 demonstrates nothing about her intentions when she made the recordings. Indeed, when Medlar contacted attorney Magness it was not for the purpose of filing a lawsuit against Cisneros. Rather, the concept of a lawsuit in which the tapes would be used emerged from Magness's analysis that he thought this was the tact Medlar should take in preference to filing for bankruptcy.[11] The use of the tapes is not the critical factor for Title III purposes. Rather, it is the party's intent in making the recording that is determinative.

█ Cisneros' second argument for suppression on Title III grounds is that the tapes were made for a tortious purpose, namely, for the purpose of publicly disclosing sensitive and intimate details of Mr. Cisneros' personal life to the public. Under Texas state law it is a tort for an individual to publicly disclose embarrassing facts of a private nature. This common-law privacy tort has three elements: (1) that publicity was given to matters concerning one's personal life; (2) that publication would be highly offensive to a reasonable person of ordinary sensibilities; and (3) that the matter publicized is not of legitimate public concern. *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 472 (Tex. 1995).

The Court is not convinced that Medlar made the tapes for the purpose of disclosing intimate details of Cisneros' personal life to the press. Medlar's stated reasons do not indicate any desire to disclose personal, or sensitive, matters not of legitimate concern to the public. Rather, she testified she was motivated by a desire to make a record of Cisneros' statements to her so that in the event she needed to correct an inaccuracy about the nature of their relationship, she would be able to do so. Medlar never indicated that the sub-

stance of any such "correction" would be of a highly personal nature such that it might embarrass or offend Cisneros or herself. Given Cisneros' stature as a well-known political figure in Texas, and the general public interest in his relationship with Medlar, it is highly unlikely that any statement about the affair would not be a matter of "legitimate public concern".

The defendant has not produced any evidence to rebut Medlar's testimony as to her reasons for making the tapes, or to otherwise suggest that her motivations were other than proper under the law. While Ms. Medlar's credibility is in issue, absent some evidence to support the defendant's theory of her motives, this Court does not find that the tapes were made in violation of Title III. Cisneros and Medlar are both charged in the Indictment. Several of the indictment's allegations receive probative support from the tapes. In a way they tend to prove the essence of what the OIC has charged, namely that the payments may well be "hush money" and thus may be deemed the "res gestae" of certain of the charges.[12]

### B. *Authenticity*

█ Cisneros' second ground for suppressing the tapes is a challenge on authenticity grounds. The determination as to whether or not tape recordings may be admissible at trial is one committed to the sound discretion of the trial court. *United States v. Haldeman*, 559 F.2d 31, 109 (D.C.Cir.1976). So long as the court makes a preliminary finding that the tapes are sufficiently authentic, accurate and trustworthy, they may be admitted. *United States v. Dale*, 991 F.2d 819, 842 (D.C.Cir.1993). In determining authenticity, the court must find that the "possibilities of misidentification and adulteration [must] be eliminated, not absolutely, but as

---

11. Similarly, Medlar's earlier discussion with attorney Patrick Maloney does not support a Title III violation. Maloney testified he was unaware of the existence of the tapes when he consulted with Medlar.

12. Black's Law Dictionary includes the following in its definition of "res gestae": "words spoken . . . . . closely connected to occurrence or event in both time and substance as to be a part of the happening".

a matter of reasonable probability". *United States v. Sandoval,* 709 F.2d 1553, 1554 (D.C.Cir.1983).

Defendant maintains that none of the tapes, nor any portions thereof, may be used as evidence in his trial because the tapes are unreliable, unauthentic copies of the originals. Specifically, Cisneros contends that since the original tapes do not exist, and Medlar redacted certain portions of the tapes, all of the tapes must be suppressed.

The OIC's position is to the contrary. According to the OIC, all 26 of the tapes, including those which Medlar admits redacting, are admissible. Under the government's theory, the tapes are highly probative of Cisneros' guilt with respect to certain counts in the indictment. Any possible prejudicial effect which may result from introducing the tapes can be overcome by having Medlar available as a witness subject to cross-examination.

This Court can not accept either party's position in its entirety. Both Cisneros and the government go too far. Cisneros' position does not allow for the possibility that many of the tapes, and certain discreet portions of others, contain unaltered, intelligible conversation whose accuracy has not been disproved. The government's position, on the other hand, does not take into consideration fully the likelihood that certain of the redactions may have contained exculpatory statements by the defendant, the absence of which can not be remedied by having only one party to the conversation, Medlar, available to "fill in the blanks".

██ In addition to hearing three weeks of testimony and argument on this issue, this Court read all 26 of the transcripts and listened carefully to the contents of the four admittedly redacted tapes the government wishes to introduce at trial. Based on its assessment of the tapes, transcripts, and the entire record made in this case, the Court finds that the vast majority of the tapes contain reliable and accurate representations of the conversations that occurred between Medlar and Cisneros between April 1990 and December 1993. Specifically, this Court finds that all portions of the 22 tapes that do not contain admitted redactions which the government intends to use clearly meet this Circuit's threshold authenticity standard. They contain intelligible, logically consistent statements by both the witness, Medlar, and the defendant that demonstrate that the tapes are what they purport to be. This is the critical factor under the "authenticity" standard. *See United States v. Traficant,* 558 F.Supp. 996, 1001–1003 (N.D.Ohio 1983) ("the most important criterion for admission is that the tapes accurately reflect the conversation which they purport to record"). Most importantly for this determination, Cisneros has presented no direct evidence that the voice on the tapes is not his, nor that the statements attributed to him are inaccurate. In cases where one party to a recorded conversation has testified as to its accuracy, and the other party against whom the statements are being used has not challenged the accuracy of the statements attributed to him, courts have admitted into evidence the relevant parts of the recording. *See United States v. Sandoval,* 709 F.2d 1553, 1554 (D.C.Cir.1983); *see also United States v. Traficant,* at 1001. This Court will do the same here and allow the jury to decide the weight it will give to this evidence.

██ A different outcome is warranted with respect to the four tapes containing admitted redactions. Certain portions of these tapes contain noticeable breaks in the recording and flow of the conversation that indicate obvious alteration. As to these particular portions, the government has failed to demonstrate that the "possibilities of misidentification and adulteration" . . . . . have been eliminated as a "matter of reasonable probability".[13] *Sandoval*

---

**13.** In ruling that the OIC has met its burden it is important to point out that the OIC did not

at 1554. The portions of the tapes containing these breaks may not be introduced in the OIC's case in chief.[14] Medlar may, however, testify as to her recollection of the omitted conversation and the defendant may, of course, cross-examine her.[15]

Included as Appendix I are the Court's Court's specific admissibility rulings with respect to the four tapes that contain noticeable, or admitted, redactions.

An appropriate Order accompanies this Memorandum Opinion.

### Appendix I

The following portions of the tapes are inadmissable:

(1) Tape Q10. Page 7, line 38 through p. 8 line 18.

(2) Tape Q13.

 i) Page 3, line 31 through p. 6 line 4.

 ii) Page 6 line 29 through p. 7 line 2.

 iii) Page 9 line 1 through line 7.

 iv) Page 14 line 1 through line 10.

 v) Page 20 line 16 through line 33.

 vi) Page 22 line 13 through page 23 line 8.

 vii) Page 24, line 30.

 viii) The entirety of Page 26.

(3) Q14. Page 1 line 36 through page 2 line 14.

(4) Q16. This tape contains one admitted redaction, at page 13, line 6. However, the redaction is preceded and followed by two complete, dis-

creet statements. Therefore, the statements before and after the redaction may come in. The jury will be instructed that certain parts of this conversation was omitted at the designated redacted line.

### *ORDER*

In accordance with the accompanying Memorandum Opinion, it is hereby

**ORDERED** that defendant, Henry G. Cisneros' Motion to Suppress and Exclude Tape Recordings Secretly Made by Defendant Medlar is **GRANTED** in part and **DENIED** in part as set forth in the accompanying Memorandum Opinion.

---

create the tapes in question. The Independent Counsel had no opportunity, therefore, to ensure their absolute accuracy. Rather, the OIC took the evidence as it found it.

**14.** In 1999, while incarcerated in Carswell, Texas, Medlar reviewed the copies of the tapes in the government's possession and attempted to identify the redacted portions and fill in, subject to her recollection at the time, the contents of the omitted conversation. Medlar's recollection as to these omitted portions are memorialized in her "Log". While

the log may not be admissible, Medlar, if called as a witness, can certainly testify to the conversation with the defendant if the statements are otherwise admissible under the rules of evidence.

**15.** If at trial authenticity of any of the tapes again becomes an issue and the facts so warrant, the court stands ready to hold an appropriate voir dire examination out of the presence of the jury.