**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

JOHN MCTIERNAN,
          *Defendant-Appellant.*

No. 10-50500

D.C. No.
2:06-cr-00259-DSF

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
July 13, 2012—Pasadena, California

Filed August 20, 2012

Before: Ronald Lee Gilman,* Richard C. Tallman, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Gilman

---

*The Honorable Ronald Lee Gilman, Senior United States Circuit Judge
for the Sixth Circuit, sitting by designation.

---

**COUNSEL**

Charles M. Sevilla (argued), Law Office of Charles Sevilla, San Diego, California; S. Todd Neal, Procopio, Cory, Hargreaves & Savitch, LLP, San Diego, California, for the defendant-appellant.

Jean-Claude André, Assistant U.S. Attorney, Los Angeles, California, for the plaintiff-appellee.

---

**OPINION**

GILMAN, Circuit Judge:

John McTiernan, a famous Hollywood movie director, hired former private investigator Anthony Pellicano in 2000 to illegally wiretap the telephone conversations of two individuals. Six years later, when the Federal Bureau of Investigation (FBI) questioned McTiernan about Pellicano's activities, McTiernan claimed that he knew nothing about any wiretapping. But the FBI had obtained a digital recording (the Recording) that Pellicano had made—unbeknownst to McTiernan—of a telephone conversation in which the two men discussed an illegal wiretap. Caught red-handed, McTier-

nan pleaded guilty to one count of making a material false statement to the FBI.

Shortly thereafter, McTiernan engaged new counsel who convinced him to seek the withdrawal of his guilty plea, which the district court eventually allowed. McTiernan was indicted again, this time on *two* counts of making a material false statement to the FBI and on one count of making a false statement to the district court during his guilty-plea hearing. His motions to suppress the Recording and to recuse United States District Judge Dale S. Fischer were denied. McTiernan then conditionally pleaded guilty to all three counts, reserving his right to appeal the district court's adverse rulings. He was sentenced to 12 months' imprisonment and ordered to pay a $100,000 fine. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

This case returns to us for a second time. In the first decision, the undisputed facts were summarized as follows:

> On February 13, 2006, McTiernan was interviewed by telephone by Special Agent Stanley Ornellas of the Federal Bureau of Investigation ("FBI") in connection with an investigation into former private investigator Anthony Pellicano's use of illegal wiretapping. Ornellas asked whether McTiernan had knowledge of Pellicano's wiretapping activities and [whether he] had previously discussed wiretapping with Pellicano. In response, McTiernan stated that he had never discussed wiretapping with Pellicano, that Pellicano had never mentioned his ability to wiretap telephone calls, and that he had used Pellicano's services only once, in connection with his divorce.

> The responses made to Special Agent Ornellas' inquiries were false. McTiernan later admitted that

he had hired Pellicano in or around August 2000 and paid him at least $50,000 to conduct an illegal wiretap of two individuals, one of whom was Charles Roven, the producer of a movie that McTiernan was then directing. Pellicano installed the wiretaps, listened to the subjects' business and personal telephone calls, and reported their contents to McTiernan.

Several weeks after Ornellas interviewed McTiernan, the government contacted McTiernan and suggested that he retain . . . an attorney. On March 4, 2006, McTiernan retained the services of John Carlton, Esq. On March 16, 2006, McTiernan met with Carlton and the government regarding McTiernan's statements to Special Agent Ornellas. At that meeting, the government revealed its evidence of discussions between McTiernan and Pellicano regarding the wiretapping. The evidence included a digital recording that Pellicano had made of a telephone conversation between himself and McTiernan (the "Recording"). The Recording, which was made on August 17, 2000, was recovered by the FBI from Pellicano's computer pursuant to a search warrant in the related investigation and prosecution of Pellicano, who was charged with over one-hundred Racketeer Influenced and Corrupt Organizations (RICO) Act violations, bribery of police officers, and wiretapping. In the Recording, Pellicano informed McTiernan, who at that time was directing a movie in Canada, that he had intercepted "tons of stuff" and that he could not "even listen to all of them." McTiernan instructed Pellicano to focus on instances where the producer was "saying one thing to the studio and saying something else to others," and said that catching the producer "bad mouthing" the "studio guys" would "really be useful."

On March 24, 2006, McTiernan entered into a written plea and cooperation agreement with the government, in which he agreed to plead guilty to a forthcoming information charging him with making a false statement [to an FBI agent] in violation of 18 U.S.C. § 1001(a)(2). . . .

. . . .

On April 17, 2006, . . . . the district court conducted McTiernan's Rule 11 [of the Federal Rules of Criminal Procedure plea] hearing. . . .

The court [ ] questioned McTiernan about his attorney's representation and read aloud the stipulated factual basis from McTiernan's plea agreement. McTiernan confirmed that he and his attorney had discussed his case candidly and that his attorney had considered and advised McTiernan as to the existence of any possible defenses. McTiernan also confirmed that he understood the consequences of his plea and that he was competent to make the plea. He then allocated [sic] to the facts, admitting that he knowingly made false statements to the FBI agent.

*United States v. McTiernan*, 546 F.3d 1160, 1163-64 (9th Cir. 2008).

The district court also asked McTiernan whether Carlton, his attorney, had advised him on how he should answer any of the court's questions during the plea hearing. McTiernan told the court: "No, he did not, ma'am." Satisfied with McTiernan's answers during the plea hearing, the court accepted his guilty plea.

Two months later, and "eleven days before McTiernan was scheduled to be sentenced, S. Todd Neal, Esq. [ ], advised the government that he would be substituted for Carlton as

McTiernan's new counsel." *Id.* at 1164. McTiernan's sentencing was continued so that Neal could properly prepare for the hearing. Two months later, McTiernan filed a motion to withdraw his guilty plea, indicating that he would seek to suppress the Recording if given the opportunity. As detailed by this court's decision on his previous appeal,

> McTiernan claimed that he was entitled to withdraw his plea because his former counsel had provided ineffective assistance. Specifically, McTiernan claimed that his former counsel (1) failed to obtain any discovery materials from the government prior to the time McTiernan entered his pre-indictment plea; and (2) failed to advise him that he could have sought to suppress the Recording on the ground that the Recording was made by Pellicano without McTiernan's knowledge and consent and for an allegedly "criminal or tortious purpose," in violation of Title III and 18 U.S.C. § 2515. . . .

> On September 24, 2007, the district court held a hearing on McTiernan's motion to withdraw his guilty plea. The court denied the motion, immediately proceeded to sentencing, and sentenced McTiernan to a term of imprisonment of four months, to be followed by a two-year period of supervised release. The district court further ordered that McTiernan pay a $100,000 fine and a $100 special assessment.

*Id.* at 1165.

McTiernan appealed, claiming that he should have been allowed to withdraw his guilty plea because his attorney at the time of his plea never informed him of the potential basis to suppress the Recording, the key evidence against him. *Id.* at 1167. This court determined that the district court had erred by not holding an evidentiary hearing to determine if McTier-

nan could establish a fair and just reason to withdraw his plea. *Id.* at 1167-69. Accordingly, the district court's judgment was vacated and the case remanded for a full evidentiary hearing on this issue. *Id.* at 1169.

Upon remand, McTiernan filed a motion requesting that Judge Fischer recuse herself from the remaining case proceedings. The motion was referred by random assignment to United States District Court Judge Terry Hatter, who denied the motion. At this point the government dropped its opposition to McTiernan's motion to withdraw his guilty plea, and the district court ordered the plea withdrawn.

No longer bound by a plea agreement, the government reindicted McTiernan on two counts of making a false statement to the FBI (one count for claiming that he had hired Pellicano only in connection with his divorce proceedings and the other for denying that he had ever discussed wiretapping with Pellicano), both in violation of 18 U.S.C. § 1001(a)(2), and on one count of making a false statement to the district court during his guilty-plea hearing, in violation of 18 U.S.C. § 1623(a) and (c). The latter charge was based on the fact that, during McTiernan's guilty-plea hearing, he told the district court that his attorney had not advised him what to say at the hearing, but he later signed a declaration in connection with his plea withdrawal stating that his attorney had coached him and gave him specific wording to use to avoid admitting certain facts.

Following his reindictment, McTiernan moved to suppress the Recording under 18 U.S.C. §§ 2511(2)(d) and 2515 and requested that the district court hold an evidentiary hearing on the motion. Both his motion and his request for a hearing were denied. He then once more moved for Judge Fischer's recusal, a request again denied by Judge Hatter.

After his motions were denied, McTiernan and the government reached a second plea agreement. The government

promised to seek a sentence of no more than 12 months' imprisonment in exchange for McTiernan entering a conditional guilty plea that reserved his right under Rule 11(a)(1)(2) of the Federal Rules of Criminal Procedure to appeal the adverse rulings of the district court. This second plea agreement was accepted by the district court, after which McTiernan was sentenced to a below-the-Guidelines term of 12 months in prison, a total fine of $100,000, and 3 years of supervised release. This timely appeal followed.

## II.   ANALYSIS

### A.   Suppression of the recorded telephone conversation

McTiernan's primary argument is that the district court erred in denying his motion to suppress the Recording. When a district court denies a motion to suppress, we review de novo its conclusions as to questions of law and mixed questions of law and fact. *United States v. Caseres*, 533 F.3d 1064, 1067 (9th Cir. 2008). Any factual findings made by the district court in ruling on the motion are reviewed under the clear-error standard. *Id.*

**[1]** Under 18 U.S.C. § 2515, "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . . if the disclosure of that information would be in violation of" 18 U.S.C. §§ 2510 through 2522. McTiernan contends that the Recording should have been suppressed pursuant to § 2515 because Pellicano made the Recording in violation 18 U.S.C. § 2511(2)(d), which prohibits anyone from intercepting an oral communication "for the purpose of committing any criminal or tortious act." Unlike the Fourth Amendment, § 2515 excludes "evidence obtained by entirely private misconduct. The limitation on use turns on improper interception . . . regardless of whether the interception was governmental or

private." *Chandler v. U.S. Army*, 125 F.3d 1296, 1298 (9th Cir. 1997) (citation omitted).

**[2]** To merit suppression under §§ 2511(2)(d) and 2515, a defendant must prove by a preponderance of the evidence that the recording at issue was made for an unlawful purpose. *United States v. Zarnes*, 33 F.3d 1454, 1469 (7th Cir. 1994). The Ninth Circuit has not previously ruled on a defendant's evidentiary burden under these circumstances, but every other circuit to consider the issue has reached the same conclusion as the Seventh Circuit. *See United States v. Cassiere*, 4 F.3d 1006, 1021 (1st Cir. 1993) (holding that the burden was on the defendant to prove by a preponderance of the evidence that the recording at issue was made for criminal or tortious purposes); *United States v. Dale*, 991 F.2d 819, 841 (D.C. Cir. 1993) (per curiam) (same); *Traficant v. Comm'r of IRS*, 884 F.2d 258, 266 (6th Cir. 1989) (same); *United States v. Truglio*, 731 F.2d 1123, 1131 (4th Cir. 1984) (same), *overruled on other grounds by United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996) (en banc); *United States v. Ruppel*, 666 F.2d 261, 271 (5th Cir. Unit A 1982) (same); *United States v. Phillips*, 540 F.2d 319, 327 (8th Cir. 1976) (same). We see no reason why the Ninth Circuit should deviate from this consensus, and thus hold that the burden was on McTiernan to prove by a preponderance of the evidence that the Recording at issue was made for a criminal or tortious purpose.

McTiernan asserts that he proved by a preponderance of the evidence that the Recording was made "for the purpose of committing a[ ] criminal or tortious act" because he presented evidence that Pellicano made the Recording as part of a recordkeeping process in support of Pellicano's "far-reaching criminal enterprise." As his principal evidence of Pellicano's purpose, McTiernan cited the opening statement that Pellicano made (in the third person) while representing himself at his own trial:

> Mr. Pellicano, during the course of his endeavors and work, would have a minimum of 50 phone calls

a day. And during that—during those phone calls there would be calls from people that he was investigating, from clients and other individuals that he needed to keep constant contact with.

Now, he decided to record those conversations for —you know, for his inventory; for safekeeping; for, in effect, to remind himself of what he needed to do and what a client professed a need to have, and thought, well, the best way to do that is . . . to record those conversations in an encrypted fashion so that no one else but Mr. Pellicano could listen to those recordings ever.

Pellicano was subsequently convicted on 78 separate counts relating to his widespread illegal wiretapping activities. The specific charges involved identity theft, wire fraud, bribery, and unauthorized access of protected computer databases.

McTiernan argues that the Recording was "for the purpose of committing a[ ] criminal or tortious act" because it served as a reminder of the illegal acts that Pellicano intended to commit. The government responds by contending that Pellicano's opening statement is not credible evidence and is therefore insufficient to prove Pellicano's purpose in making the Recording. Although the district court acknowledged the "questionable" evidentiary value of the opening statement, it assumed for the purposes of its ruling that McTiernan had demonstrated that the Recording was made as a part of Pellicano's effort to create a digital "to do" list of criminal tasks. The court nonetheless determined that such a purpose was not criminal or tortious, explaining:

There is some evidence that Pellicano kept the phone recordings of his conversations to remind himself of "things he needed to do." However, even assuming that the "things he needed to do" were criminal or tortious in some way, the Court rejects the proposi-

tion that this alone demonstrates that the recordings were made for the purpose of committing a criminal act. [McTiernan's] definition of "for the purpose of committing a criminal or tortious act" would include virtually any recording related to a criminal act made by one of the criminal participants because such a recording could always be construed as "recordkeeping" under [McTiernan's] excessively broad definition. There is no evidence that the Recording was to be used for a criminal or tortious act independent of the very criminal acts described in the Recording itself. Shielding defendants from their own self-made evidence of their crimes cannot be what Congress intended in enacting § 2515.

(Citation and footnotes omitted.)

We find the district court's analysis persuasive. Like the district court, we need not determine whether the opening statement is sufficient evidence of Pellicano's purpose in recording his conversation with McTiernan because even if the Recording was a "to do" list of criminal activities as McTiernan asserts, it was not made "for the purpose of committing any criminal or tortious act."

**[3]** The Ninth Circuit has never previously addressed this specific issue, but we have held that "the focus [of the inquiry] is not upon whether the interception itself violated another law; it is upon whether the *purpose* for the interception—its intended use—was criminal or tortious." *Sussman v. Am. Broad. Cos.*, 186 F.3d 1200, 1202 (9th Cir. 1999) (internal quotation marks omitted) (emphasis in original). For § 2511(2)(d) to apply, the recording must have been "done for the purpose of facilitating some further impropriety, such as blackmail." *Id.*

**[4]** In a civil action involving a claim of invasion of privacy under § 2511, we have also held that, in enacting § 2511,

"Congress . . . intended to permit one party to record [a] conversation with another when the recorder is acting 'out of a legitimate desire to protect himself.' " *Moore v. Telfon Commc'ns Corp.*, 589 F.2d 959, 966 (9th Cir. 1978) (quoting 114 Cong. Rec. 14694 (May 23, 1968)). Many other circuits have echoed the reasoning set out in *Moore. See United States v. Cassiere*, 4 F.3d 1006, 1021 (1st Cir. 1993) (holding that the recording of a telephone conversation between coconspirators in which they discussed details of their wire-fraud scheme was not made for a criminal or tortious purpose when it was made to prevent future misrepresentations of the conversation); *United States v. Dale*, 991 F.2d 819, 840-42 (D.C. Cir. 1993) (affirming the district court's denial of a motion to suppress under § 2515 where one coconspirator recorded a conversation with his coconspirators to prevent later accusations that he had a leadership role in the conspiracy); *United States v. Underhill*, 813 F.2d 105, 110 (6th Cir. 1987) ("Generally, when the purpose of an interception is to make or preserve an accurate record of a conversation in order to prevent future distortions by a participant, the interception is legal."); *By-Prod Corp. v. Armen-Berry Co.*, 668 F.2d 956, 959-60 (7th Cir. 1982) (concluding that there was no violation of § 2511(2)(d) when the recording was intended to be used as evidence of an illegal conspiracy); *United States v. Ruppel*, 666 F.2d 261, 271 (5th Cir. Unit A 1982) (affirming the district court's denial of a motion to suppress under § 2515 where the participant recorded the conversation to enhance his plea-bargaining position); *United States v. Phillips*, 564 F.2d 32, 34 (8th Cir. 1977) (same as *Cassiere*).

**[5]** Unlike the recordings in *Moore* and the related cases cited above, Pellicano's Recording was not made to protect himself. But Pellicano's purpose of having a "to do" list was perhaps even more innocuous. The fact that Pellicano was recording a conversation in which an illegal enterprise was discussed is not determinative under § 2511(2)(d) because *Sussman* requires that we look to the purpose and not to the subject matter of the recording. *See* 186 F.3d at 1202. In other

words, the purpose of recording a conversation to create a reminder list (even a list of illegal acts that are agreed to be done) is not a criminal or tortious purpose. Such a recording is not essential to the actual execution of an illegal wiretap, unlike a recording of a conversation made for the purpose of blackmailing another person, which directly facilitates the criminal conduct of blackmail. In sum, recording a conversation for the purpose of creating a reminder list is not an integral part of the execution of an illegal wiretap and thus is not made "for the purpose of committing any criminal or tortious act."

McTiernan, however, cites two district court cases, *United States v. Lam*, 271 F. Supp. 2d 1182 (N.D. Cal. 2003), and *United States v. Vest*, 639 F. Supp. 899 (D. Mass. 1986), *aff'd*, 813 F.2d 477 (1st Cir. 1987), to support the opposite conclusion—that Pellicano's recording was done for the purpose of committing criminal or tortious acts. But both cases are distinguishable.

The recordings in *Lam* were made by an illegal gambling operation to serve as proof of telephone bets that the defendant had placed. Although the district court in *Lam* suppressed the recordings under §§ 2511(2)(d) and 2515, the question of whether the recordings at issue were made for the purpose of committing criminal or tortious acts never arose because the government conceded their illegal purpose. 271 F. Supp. 2d at 1184. And the district court did not explain the basis for this concession. We therefore find *Lam* unpersuasive on the point at issue.

*Vest* is also distinguishable from the present case. Defendant George Vest, a police officer, was the middleman in a bribery conspiracy involving Jesse James Waters and police officer Frank Tarantino. Waters had shot Tarantino and was consequently indicted for assault with the intent to commit murder, among other charges. Not wanting to go to prison, Waters promised to make a series of cash payments totaling

$300,000 to Tarantino in exchange for Tarantino "fixing" Waters's trial so that Waters would not be sentenced to a term of imprisonment. Vest agreed to physically transfer the payments from Waters to Tarantino. But Vest lied when called before a grand jury, denying that he knew anything about the bribery scheme.

Unbeknownst to Vest, Waters had tape recorded their conversation when he brought Vest the first payment because "he wanted to have . . . proof [of the exchange], in case Tarantino denied receiving the money." *Vest*, 639 F. Supp. at 906. After Waters received a prison sentence despite Tarantino's promises, Waters had several acquaintances tell Vest that "the tape would be turned over to the federal authorities if the agreement with Tarantino was not carried out." *Id.*

Vest moved to suppress the tape at his subsequent perjury trial on the ground that Waters made the recording "for the purpose of a[ ] criminal or tortious act" under § 2511(2)(d). The district court granted Vest's motion, finding that Waters's intent in making the tape was "to force Tarantino to fulfill his end of the bargain," thereby advancing their criminal conspiracy. *Id.* at 907.

**[6]** This finding of intent is the key distinction between *Vest* and the present case. Waters made his tape recording so that he could later extort Tarantino, whereas Pellicano made the Recording simply to remind himself of what he had agreed to do. Unlike recordkeeping, blackmail in and of itself is a criminal act, which explains why the court in *Vest* suppressed the recording. Because there is no assertion that Pellicano had any similar criminal intent in making the Recording here, we conclude that the district court did not err in denying McTiernan's motion to suppress.

## B.   Evidentiary hearing

McTiernan alternatively argues that even if we do not reverse the district court's denial of his motion to suppress,

we should remand for an evidentiary hearing on the issue. A district court's decision not to conduct an evidentiary hearing on a motion to suppress is reviewed under the abuse-of-discretion standard. *United States v. Quoc Viet Hoang*, 486 F.3d 1156, 1163 (9th Cir. 2007).

**[7]** "An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *Id.* (internal quotation marks omitted). If an evidentiary hearing were held in this case, McTiernan asserts that he would call witnesses to demonstrate that Pellicano made the Recording for the purpose of having something to remind himself of the criminal acts he intended to commit. The district court, however, assumed for the purposes of its ruling that McTiernan had proven that recordkeeping was indeed Pellicano's purpose in making the Recording, and we do the same. An evidentiary hearing on this point is thus unnecessary. The district court therefore did not abuse its discretion in declining to hold an evidentiary hearing.

## C. Recusal of Judge Fischer

The final issue that McTiernan raises on appeal is whether Judge Hatter erred in denying McTiernan's two motions for Judge Fischer's recusal under 28 U.S.C. § 144 and § 455(a). McTiernan argues that recusal was warranted because Judge Fischer (1) made a series of hostile comments about him during court proceedings, and (2) repeatedly denied motions to suppress Pellicano's recordings under 18 U.S.C. §§ 2511(2)(d) and 2515 that were brought by McTiernan in his own proceeding and by another defendant in a related action before her. Rulings on motions for recusal are reviewed under the abuse-of-discretion standard. *United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000).

**[8]** "The substantive standard for recusal under 28 U.S.C. § 144 and 28 U.S.C. § 455 is the same: Whether a reasonable

person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997) (per curiam) (brackets and internal quotation marks omitted). Importantly, "[p]arties cannot attack a judge's impartiality on the basis of information and beliefs acquired while acting in his or her judicial capacity." *United States v. Frias-Ramirez*, 670 F.2d 849, 853 n.6 (9th Cir. 1982). As the Supreme Court has explained,

> opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Liteky v. United States*, 510 U.S. 540, 555 (1994); *accord Wilkerson*, 208 F.3d at 799 ("To disqualify a judge, the alleged bias must constitute animus more active and deep-rooted than an attitude of disapproval toward certain persons because of their known conduct." (internal quotation marks omitted)).

McTiernan first argues that Judge Fischer should have been disqualified from his case because of "hostile" comments that she made about him in various proceedings and orders. He points to the following comments made by Judge Fischer in her September 25, 2007 order that denied McTiernan's motion to withdraw his guilty plea:

> McTiernan is clearly willing to lie whenever it suits his purpose, whether or not he has been advised of the ramifications of doing so. . . . [A]nd he is either

lying to this Court now or he lied when signing the
plea agreement and entering his plea in open court.
. . . These statements are patently absurd on several
levels. . . . Bluntly stated, the Court finds McTier-
nan's allegations to be false. . . . McTiernan's
alleged . . . reasons for seeking withdrawal lack cred-
ibility.

Then, in an order issued on October 2, 2007, Judge Fischer
reiterated that "Mr. McTiernan [had] lied in his declaration"
supporting the motion for withdrawal of his guilty plea and
had "breached his promise to be truthful with the Court."

[9] These statements, however, do not demonstrate that
Judge Fischer had a deep-seated animus toward McTiernan,
but only that she acquired "an attitude of disapproval" toward
him because of his known conduct—specifically, his lies to
federal officers. He did, after all, later plead guilty to two
charges of lying to the FBI and to one charge of lying to the
court.

"[E]xpressions of impatience, dissatisfaction, annoyance,
and even anger, that are within the bounds of what imperfect
men and women, even after having been confirmed as federal
judges, sometimes display," do not establish bias or partiality.
*Liteky*, 510 U.S. at 555-56. The judge who has become "ex-
ceedingly ill disposed towards the defendant . . . . is not
thereby recusable for bias or prejudice, since [her] knowledge
and the opinion it produced were properly and necessarily
acquired in the course of the proceedings." *Id.* at 550-51.

[10] Furthermore, Judge Fischer's comments about
McTiernan at his sentencing hearings had absolutely no nega-
tive effect on his ultimate sentence. He was given a term of
12 months' imprisonment, a below-the-Guidelines sentence
that was exactly what he expected under the terms of his sec-
ond plea agreement, even though Judge Fischer had the dis-
cretion to give him more time. Judge Fischer also exercised

her discretion to allow McTiernan to remain free on bail pending appeal, which again negates his claim that she harbored a deep-seated animus toward him. Moreover, "the judge's conduct during the proceedings should not, except in the 'rarest of circumstances' form the sole basis for recusal under § 455(a)." *United States v. Holland*, 519 F.3d 909, 914 (9th Cir. 2008) (footnote omitted) (quoting *Liteky*, 510 U.S. at 555). Judge Fischer's statements in her orders or at the sentencing hearings, therefore, do not warrant her recusal.

McTiernan alternatively argues that Judge Fischer's "prejudgment" of the suppression issue required her recusal. In support of this claim, he highlights her previous rulings in the related criminal action against Terry Christensen. Christensen, who had been tried as Pellicano's coconspirator, had moved to suppress recordings that Pellicano had made of their telephone conversations, but Judge Fischer had denied Christensen's motion to suppress.

**[11]** The problem with McTiernan's argument is that a "judge's prior adverse ruling is not sufficient cause for recusal." *Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir. 1993) (per curiam) (internal quotation marks omitted); *cf. United States v. Monaco*, 852 F.2d 1143, 1147 (9th Cir. 1988) ("[K]nowledge obtained from judicial proceedings involving a codefendant does not require recusal."). Judge Fischer's prior decision in Christensen's case is therefore not evidence of any unwarranted bias or prejudice.

McTiernan nevertheless contends that Judge Fischer's remark in her September 25, 2007 order denying his motion to withdraw his guilty plea—that McTiernan's and Christensen's purported basis for suppressing Pellicano's recordings "doesn't even come close" to warranting an evidentiary hearing for a motion to suppress—demonstrates that she had prejudged the issue. This court subsequently vacated that order in *United States v. McTiernan*, 546 F.3d 1160 (9th Cir. 2008), and directed Judge Fischer to hold an evidentiary hearing on

whether McTiernan had a fair and just reason to justify the withdrawal of his guilty plea.

**[12]** Although this court concluded that Judge Fischer erred in her September 25, 2007 decision, her doesn't-even-come-close comment was not so egregious as to require her removal from the case. This is especially true because, for the reasons previously stated, we fully agree that an evidentiary hearing on the suppression issue was unnecessary. We further note that "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand." *Liteky*, 510 U.S. at 551.

**[13]** In sum, McTiernan has shown no ground to warrant Judge Fischer's disqualification from his case. The district court accordingly did not abuse its discretion in denying McTiernan's two motions for Judge Fischer's recusal.

## III. CONCLUSION

For all the reasons set forth above, the district court's judgment is **AFFIRMED**.